IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No.  10-cv-00609-PAB-MEH

THE INDEPENDENCE INSTITUTE,
JON CALDARA,
DENNIS POLHILL,
JESSICA CORRY,
MASON TVERT,
RUSSELL HAAS,
DOUGLAS CAMPBELL,
LOUIS SCHROEDER,
SCOTT LAMM,
ALBIE HURST, and
DANIEL KENNEDY,

      Plaintiffs,

v.

BERNIE BUESCHER, in his official capacity as Colorado Secretary of State,

      Defendant.

---

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

---

      This civil rights case comes before the Court on plaintiffs' motion for preliminary injunction [Docket No. 15].  Plaintiffs, who are involved in the ballot initiative process in Colorado, challenge several aspects of the state statutes which govern the process. The Court heard testimony presented by plaintiffs and defendant over the course of three days.

      In their second amended complaint, plaintiffs assert ten claims for relief – nine alleging a violation of the First Amendment's protection of the exercise of free speech and one claim alleging both a violation of free speech and a violation of the due process

clause of the Fourteenth Amendment. Plaintiffs bring their claims under 42 U.S.C. § 1983. Therefore, the Court's jurisdiction over this matter is premised upon the existence of a federal question pursuant to 28 U.S.C. § 1331.

Plaintiff standing is often at issue in cases regarding ballot initiatives and referenda. *See, e.g.*, *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1087-97 (10th Cir. 2006). "The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *City of Colorado Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1078-79 (10th Cir. 2009) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). In order to establish that he or she has standing, a plaintiff must show three things: injury in fact, causation, and redressability. *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1101 (10th Cir. 2001). For purposes of the present motion, it is sufficient to note that plaintiffs Caldara and Tvert have standing to challenge the statutes at issue by virtue of the ballot initiatives that they presently have pending and their demonstrated involvement in the initiative process.

This order addresses the claim which plaintiffs have described as the "heart of the matter," namely, their fifth claim for relief, which challenges the constitutionality of Colorado's limitation on paying petition signature gatherers by the signature and which is most time-sensitive given the upcoming deadline for turning in those signatures to the Secretary of State's office. This order also addresses plaintiffs' eighth and ninth claims for relief, to the extent that they challenge statutory provisions which enforce the payment restriction previously described. A subsequent order will address the remainder of plaintiffs' motion for preliminary injunction.

2

## I. FINDINGS OF FACT

In 2009, the Colorado General Assembly passed and the Governor signed into law House Bill 09-1326 ("H.B. 1326"), which amended the rules and procedures dealing with the initiative and referendum processes in Colorado. Section 10 of H.B. 1326, which was codified in the Colorado Revised Statutes at Colo. Rev. Stat. § 1-40-112(4) (2010), states as follows: "It shall be unlawful for any person to pay a circulator more than twenty percent of his or her compensation for circulating petitions on a per signature or petition section basis."[1] Violation of this portion of H.B. 1326, which went into effect on July 1, 2009, appears to be a misdemeanor punishable by up to one year in jail and a $1500 fine. *See* Colo. Rev. Stat. §§ 1-40-130(1)(h) and (2).

Section 2 of H.B. 1326 contains the following legislative findings:

The general assembly finds, determines, and declares that:

(I)     The initiative process relies upon the truthfulness of circulators who obtain the petition signatures to qualify a ballot issue for the statewide ballot and that during the 2008 general election, the honesty of many petition circulators was at issue because of practices that included: Using third parties to circulate petition sections, even though the third parties did not sign the circulator's affidavit, were not of legal age to act as a circulator, and were paid in cash to conceal their identities; providing false names or residential addresses in the circulator's affidavits, a practice that permits circulators to evade detection by persons challenging the secretary of state's sufficiency determination; circulating petition sections without even a rudimentary understanding of the legal requirements relating to petition circulation; and obtaining the signatures of persons who purported to notarize circulator

---

[1] Colorado law allows candidates for elective statewide offices to file petitions in order to qualify for the ballot in those races. *See* Colo. Rev. Stat. § 1-4-801 (2010) (major party candidates); Colo. Rev. Stat. § 1-4-802 (2010) (minor party candidates). The limitations in § 1-40-112(4) on paying petition circulators on a per-signature basis do not apply to candidate petitions.

affidavits, even though such persons were not legally authorized to act as notaries or administer the required oath;

(II)     The per signature compensation system used by many petition entities provides an incentive for circulators to collect as many signatures as possible, without regard for whether all petition signers are registered electors; and

(III)    Many petition circulator affidavits are thus executed without regard for specific requirements of law that are designed to assist in the prevention of fraud, abuse, and mistake in the initiative process.

Colo. Rev. Stat. § 1-40-101(2)(a) (2010).  The legislative findings of H.B. 1326 also

include the following conclusions:

Therefore, the general assembly finds, determines, and declares that:

(I)      As a result of the problems identified in paragraphs (a) and (b) of this subsection (2), one or more ballot measures appeared on the statewide ballot at the 2008 general election even though significant numbers of the underlying petition signatures were obtained in direct violation of Colorado law and the accuracy of the secretary of state's determination of sufficiency could not be fully evaluated by the district court; and

(II)     For the initiative process to operate as an honest expression of the voters' reserved legislative power, it is essential that circulators truthfully verify all elements of their circulator affidavits and make themselves available to participate in challenges to the secretary of state's determination of petition sufficiency.

Colo. Rev. Stat. § 1-40-101(2)(c) (2010).

H.B. 1326 does not strictly prohibit paying petition circulators by the number of

signatures that they gather, but rather limits per-signature compensation to 20% of a

petition circulator's overall compensation.  Colo. Rev. Stat. § 1-40-112(4) (2010).  As a

practical matter, however, the 20% provision requires petition proponents to pay

signature gatherers on an hourly basis.  Edward Agazarm, a vice president of a petition

management firm with nineteen years of experience in signature gathering, testified that

under H.B. 1326 the payment options are either salary or pay by the hour.  Tr. 274.

Michael Arno, who owns a company that qualifies initiatives for the ballot, albeit one

with relatively little Colorado experience, testified that he does not think that anyone in

Colorado could safely compensate on a per signature basis for fear of running over the

20% limit and thereby incurring penalties.  Tr. 31.  No witness with experience in

signature gathering testified that the ability to pay up to 20% of a circulator's

compensation on a per-signature basis would provide an advantage over a purely

hourly payment scheme.  In fact, when the State's expert on hourly payment, Ted

Blaszak, was asked if he would use the 20% pay-per-signature provision in a Colorado

ballot initiative, he did not say that he would, but rather described other incentive

methods he would utilize.  Tr. 137.  Thus, although § 1-40-112(4) could be

characterized as a hybrid provision as opposed to an outright ban on payment by

signature, it nevertheless, as a practical matter, has the effect of an outright ban on

payments per signature.

### A.  Section 1-40-112(4)'s Effect on Cost of Signature Gathering

The testimony by both sides established that the effect of H.B. 1326 is to raise

the per-signature cost of a ballot initiative campaign.  Michael Arno testified that his

petition business has gathered 200 million signatures since 1979.  Tr. 16.  He has

qualified approximately fifty-nine ballot measures using the pay-per-signature method

and eight by the pay-per-hour method.  Tr. 25.  He experienced a doubling of costs

using hourly compensation.  Tr. 27.  Edward Agazarm testified that paying by the hour

costs more because that compensation model usually attracts lower quality workers

with less experience in signature gathering.  As a result, the petition gathering firm must

train them, which adds to the cost. Also, because hourly workers are employees as opposed to independent contractors, the petition gathering firm that hires them must pay state and local employment taxes, unlike the case with pay-per-signature workers.

Petition gathering firms that compensate on a pay-per-signature basis often rely on a group of itinerant circulators numbering between 250 and 600 who, although they necessarily have other jobs during the off-cycle, are the closest thing there are to professional signature gatherers. These people can earn between $50,000 and $150,000 per year gathering signatures in different states. Tr. 18. These professional circulators are characterized by the following: they gather a large number of signatures per day, they are familiar with the laws in the various states about signature gathering and therefore do not need to be trained, and they are well known to, and can be easily contacted by, petition gathering firms. Tr. 18, 89, 319. Arno testified that the professional signature gatherers rely on their reputations to get work and are blackballed among petition firms if they do not do their jobs well. Tr. 47. Arno, Agazarm, and Scott Lamm of Lamm Consulting, a Colorado petition firm, testified that very few of the professional signature gatherers will work on an hourly basis. Tr. 40, 63, 274. Agazarm used to be a professional circulator. Tr. 275. Furthermore, Arno's, Agazarm's, and Lamm's testimony regarding the unwillingness of professional signature gatherers to work for hourly compensation was confirmed by Blaszak, who said that he has interviewed many of them, and they will not work on an hourly basis. Tr. 155.

The economic effect of the professional circulators' apparent unwillingness to work in Colorado given § 1-40-112(4) is not entirely clear. Lamm testified that he does not think that he could get a petition qualified without the professional signature

gatherers.  Tr. 64.  Alban Hurst, who runs a petition firm called Ballot Initiative Access, testified that if time were short and he had lots of money, he could hire the best of the professionals and qualify an issue.  Tr. 312.  Arno, however, said that the most important variable was time.  With a "full clock," a petition firm could qualify a petition with hourly workers; with less time, it would be more difficult.  Tr. 41. The Court finds that the likely effect of the unavailability of the professional signature gatherers in Colorado due to § 1-40-112(4)'s limitation on pay-per-signature compensation is not so much an increase in the cost per signature, although that could happen, but rather the elimination of a group of signature gatherers best able to collect a large number of signatures in a short amount of time.

Ted Blaszak testified for defendant Secretary of State ("the State") concerning the benefits of the hourly payment model.  Since 2000, Blaszak has owned Democracy Resources, a firm which primarily gathers signatures for ballot initiatives in Oregon, although it also operates in seven other states.  Blaszak's firm has gathered at least two million signatures since 2000.  Although Blaszak has paid circulators on a per-signature basis in the past, he prefers paying on an hourly basis.  Tr. 112.  Blaszak agreed that paying hourly workers' FICA and other employment taxes increased his costs compared to using pay-per-signature workers.  Tr. 128.  He testified that he typically pays between $9 and $12 per hour, Tr. 113, which attracts mainly local workers.  Tr. 156.  Blaszak concluded that the pay-per-hour compensation method was marginally more expensive than a pay-per-signature method.  Tr. 170.  For example, during a petition campaign in California, his price per signature using hourly payment worked out to be $2.25 per signature whereas a competitor's pay-per-signature costs were $2.12 per signature.  Tr.

125.  In a petition campaign in Washington State, Blaszak's bid of $2.25 per signature under a pay-per-hour model lost out to a pay-per-signature bid of $1.85.  Tr. 125-26.  Blaszak estimated that his bid in Colorado after the passage of H.B. 1326 would work out to $2.50 per signature.  Mason Tvert, who is the sponsor of a ballot initiative currently pending in Colorado, testified that he has spoken to three or four ballot petition firms this year and has received bids ranging from $2.50 to $3.50 per signature.  Tr. 290.  He said that Lamm Consulting, one of the firms from whom he received a bid, told him that the cost would have been $1.40 per signature before the passage of H.B. 1326.  Tr. 302.

Based on the evidence presented at the hearing, the Court finds that the effect of § 1-40-112(4) is to raise the cost per signature for a ballot petition campaign by at least 6% to 18% and potentially as much as a dollar per signature.

## B.  Section 1-40-112(4)'s Effect on Reducing Fraud and Invalidity

As referred to above, H.B. 1326 included the following legislative findings regarding fraud and invalid signatures:

> The per signature compensation system used by many petition entities provides an incentive for circulators to collect as many signatures as possible, without regard for whether all petition signers are registered electors; and
>
> Many petition circulator affidavits are thus executed without regard for specific requirements of law that are designed to assist in the prevention of fraud, abuse, and mistake in the initiative process.

Colo. Rev. Stat. § 1-40-101(2)(a)(II)-(III) (2010).  Many of the witnesses at the hearing testified about fraud and invalidity.  Tr. 19, 35, 69, 180.  An invalid signature typically means a signature by someone who turns out not to be a registered voter in the State

of Colorado.  The problems posed by fraud and invalidity are different.  The State of Colorado does not require that signature gatherers confirm that a signer is a registered voter in Colorado.  Rather, a signature gatherer must attest that "to the best of [my] knowledge and belief each of the persons signing the petition section was, at the time of signing, a registered elector [of the State of Colorado]."  Colo. Rev. Stat. § 1-40-111(2)(a).  Thus, while petition gatherers are supposed to ask potential signers if they are registered voters, the gatherers do not know whether a person signing the petition is actually a registered voter beyond the signer's representation to that effect.  As it turns out, about 25% of the time the signer is not a registered voter living at the address he or she lists on the petition.  Petition company owners Michael Arno, Scott Lamm, and Ted Blaszak testified that their invalidity rates are usually 25%.  Tr. 19, 69, 131.  The 25% invalidity rate seems to be a fairly consistent rate in different parts of the country.  Tr. 19.

Kathryn Mikeworth is the manager of the ballot access program for the Colorado Secretary of State.  She testified that the State of Colorado responds to the issue of invalidity by examining a randomized 5% of the signatures collected on any given petition and by checking to determine what percentage of those signatures is valid.  Once the invalidity rate for the 5% sample is determined, that invalidity rate is used to discount the total number of signatures collected.  If the "presumed valid number of signatures" is 110% of the minimum number of signatures required to qualify for the ballot, the measure automatically qualifies.  If the presumed valid number of signatures is between 90% and 110% of the number needed to qualify, the Secretary of State's Office does a line by line review of the signatures to determine validity.  Since 2004, the

9

Secretary of State's Office has done two line by line reviews out of approximately 33 ballot initiatives.

Ballot petition fraud is a crime in the State of Colorado. *See* Colo. Rev. Stat. §§ 1-13-106, 1-40-130. Examples of fraudulent practices include forging signatures, telling signers that they do not need to be registered voters, and tricking people into signing two different petitions by claiming that two signatures are needed on the same petition. Whereas most invalid signatures appear to be the result of the signer not knowing his or her status as a registered voter or intentionally writing a clearly fictitious name such as "Mickey Mouse," forging a signature on a ballot petition is a purposeful attempt to deceive the Secretary of State's Office into accepting a signature as that of a registered voter. Tr. 180. Although, as discussed above, the Secretary of State's Office does a random check for invalid signatures, it does not check for forged signatures when it reviews a petition. Only one person has been prosecuted for ballot initiative fraud in the last eight years in Colorado. Mikeworth testified that her office does not have the time or resources within the 30-day period of time allowable under state law to detect forged signatures. *See* Colo. Rev. Stat. § 1-40-132. As a result, Mikeworth testified that the State of Colorado relies on signature gatherers to collect genuine signatures.

In 2008, the Colorado Secretary of State's Office received hundreds of verbal complaints about petition circulators and 10 to 20 written complaints. No evidence was presented as to what percent of these complaints related to paid circulators (who, in 2008, were presumptively paid per signature, *see* Tr. 85) as compared to volunteer circulators. The State admitted three written complaints from the 2008 petition cycle at the hearing. *See* Exs. W, X, Y. One complaint, from plaintiff Jessica Corry, alleged

10

that two paid circulators for Initiative 82 were misrepresenting the issues raised by

Amendment 46, a competing and contrary ballot initiative.  *See* Ex. W at DEF_00189.

The other two complaints alleged that four circulators told potential signers that they did

not need to be registered to vote as long as they intended to register soon, an unlawful

practice.  *See* Colo. Rev. Stat. § 1-40-111.  However, one of the four circulators was a

volunteer, *see* Ex. Y at DEF_00207, and the complaint is silent as to whether the other

three were paid, *see* Exs. X, Y.

Michael Arno and Scott Lamm both testified that they believe that less than 1%

of signatures are forged.  Tr. 36, 70.  Neither explained the basis of his opinion.  Arno

said that the pay-per-signature method does not increase the incentive to commit fraud.

Tr. 42.  Blaszak, on the other hand, testified that paying circulators on a per-signature

basis does increase the incentive to turn in forged signatures.  Tr. 141.  Blaszak

qualified his opinion in two respects, however.  First, he acknowledged that fraud does

not happen "in mass" using pay per signature.  Second, he admitted that the various

incentives that he provides to his hourly workers to be more productive (such as

bonuses, raises, and prizes, *see* Tr. 137-38) also give his hourly workers a motivation to

commit fraud since productivity is measured in terms of signatures gathered.  Tr. 162.

Arno testified that the professional signature gatherers are not motivated by pay-per-

signature compensation to commit fraud since they depend upon their reputations

within the business and will get blackballed if they commit fraud.  Tr. 42, 47.  Blaszak

confirmed this when he testified that signature fraud is not usually committed by the

professional signature gatherers, but rather is committed by local people (sometimes

hired by the professionals) who are not well trained.  Tr. 140.

The most knowledgeable witness on the issue of fraud was Dr. Daniel Smith, an associate professor at the University of Florida and a recognized authority on ballot initiatives. Dr. Smith testified that he is one of the few people who has examined actual petitions and has done an analysis of fraudulent signature gathering in a couple of states. Tr. 180. He testified that "[i]t's very difficult to determine . . . whether or not certain types of signature gathering necessarily leads to higher levels of fraud than others." Tr. 181. He also testified as follows in response to a question from defense counsel:

> Question: Dr. Smith, in your opinion does paying signature gatherers by the signature incentivize them to commit fraud?
>
> Answer: No, I don't think I would go that far. I honestly don't think that the pay per signature model necessarily induces fraud.

Tr. 182. Dr. Smith's testimony, unlike other opinions about fraud offered at the hearing, is grounded on an examination of actual petitions and is the product of a neutral analysis. Based on Dr. Smith's testimony and in consideration of the other evidence offered at the hearing, the Court finds that pay-per-signature compensation is no more likely than pay-per-hour compensation to induce fraudulent signature gathering or to increase invalidity rates.

## II. LEGAL STANDARD – PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, the moving party bears the burden of establishing that four factors weigh in his or her favor: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208

(10th Cir. 2009) (citing *Winter v. Natural Resource Defense Council, Inc.*, --- U.S. ----, 129 S. Ct. 365, 374 (2008)). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (internal quotation marks omitted). "[T]he limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *See Schrier v. University of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted). Consequently, granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enterprise Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

There are three types of disfavored preliminary injunctions: preliminary injunctions that alter the status quo; "mandatory preliminary injunctions" which require a party to take some affirmative act rather than refrain from some act; and preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) (citing *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd on other grounds*, 546 U.S. 418 (2006)). Before a court grants a disfavored preliminary injunction, a movant seeking such an injunction must make a heightened showing of the four factors. *RoDa Drilling*, 552 F.3d

at 1209; *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1177 (10th Cir. 2003), *aff'd en banc*, 389 F.3d 973 (10th Cir. 2004).

## III. ANALYSIS

### A. Whether Plaintiffs' Preliminary Injunction is Disfavored

Defendant argues that plaintiffs' requested injunction would alter the status quo and, as a result, is disfavored in this Circuit. The status quo is defined as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (internal quotation marks omitted). Ultimately, "the definition of 'status quo' for injunction purposes depends very much on the facts of a particular case." *O Centro Espirita*, 342 F.3d at 1178. "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Dominion Video*, 269 F.3d at 1155.

In the present case, the last uncontested status between the parties was the time prior to the effective date of the statute at issue. Therefore, the plaintiffs are not seeking an injunction which alters the status quo. Furthermore, because plaintiffs seek to enjoin the application of certain laws, they are not requesting a disfavored mandatory injunction. Finally, the State has not argued that, under the motion for preliminary injunction, plaintiffs would be afforded all the relief that they could recover at the conclusion of a full trial on the merits.

**B.  Likelihood of Success on the Merits**

*1.  The Initiative Process in Colorado*

"The Colorado Constitution reserves to the people the power to enact laws and constitutional amendments by initiative, and to reject by referendum laws passed by the general assembly."  *Campbell v. Buckley*, 203 F.3d 738, 740 (10th Cir. 2000), *cert. denied*, 531 U.S. 823 (2000) (citing Colo. Const. art. V, § 1(1) ("[T]he people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly and also reserve power at their own option to approve or reject at the polls any act or item, section, or part of any act of the general assembly.")).  An initiative to amend the Colorado Constitution is placed on the ballot only where the proponent provides a petition "in such form as may be prescribed pursuant to law" with the required number of signatures of registered electors and does so at least three months before the general election.  Colo. Const. art. V, § 1(2).  The Colorado General Assembly is empowered to enact certain regulations regarding the initiative process based upon both the Colorado Constitution, *see American Constitutional Law Foundation, Inc. v. Meyer*, 120 F.3d 1092, 1096 (10th Cir. 1997) (citing *Committee for Better Health Care v. Meyer*, 830 P.2d 884, 893 (Colo. 1992); Colo. Const. art. V, § 1(2); Colo. Const. art. VII, § 11), and Article I Section 4 of the United States Constitution, *see Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

### 2. First Amendment – Legal Standard

"The First Amendment, made applicable to the states by the Fourteenth Amendment, provides 'Congress shall make no law . . . abridging the freedom of speech.'" *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1027 (10th Cir. 2008) (citing U.S. Const. amend. I) (omission marks in original). As a starting point, there is no independent right under the First Amendment to place a measure on the ballot via initiative. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210-11 (10th Cir. 2002) ("[N]othing in the language of the [United States] Constitution commands direct democracy, and we are aware of no authority supporting this argument. In fact, every decision of which we are aware has held that initiatives are state-created rights and are therefore not guaranteed by the U.S. Constitution."). "In other words, the right to free speech and the right to vote are not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech associated with an initiative procedure." *Save Palisade FruitLands*, 279 F.3d at 1211. Therefore, "even though the initiative and referendum process is not guaranteed by the United States Constitution, Colorado's choice to reserve it does not leave the state free to condition its use by impermissible restraints on First Amendment activity." *Campbell*, 203 F.3d at 742 (quoting *American Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1100 (10th Cir. 1997)). Those who "seek by petition to achieve political change in Colorado" have a "right freely to engage in discussions concerning the need for change [that] is guarded by the First Amendment." *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236, 1241 (10th Cir. 2002) (quoting *Meyer v. Grant*, 486 U.S. 414, 421 (1988)).

Generally speaking, "petition circulation is core political speech, because it involves interactive communication concerning political change." *Chandler*, 292 F.3d at 1241 (quoting *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999)) (alteration marks, omission marks, and quotation marks omitted). As a result, First Amendment protection for such activity is often said to be "at its zenith." *Chandler*, 292 F.3d at 1241 (quoting *Buckley*, 525 U.S. at 187).

The status of petition circulation as "core political speech," however, does not mean that the First Amendment bars all attempts by a state to regulate how it is conducted. *See American Constitutional Law Found.*, 120 F.3d at 1097. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Chandler*, 292 F.3d at 1241 (quoting *Buckley*, 525 U.S. at 187). As the Tenth Circuit Court of Appeals noted, "Colorado has a strong interest in ensuring both candidate elections and ballot issues are run fairly, efficiently, and honestly." *American Constitutional Law Found., Inc.*,120 F.3d at 1098, *aff'd sub nom. Buckley*, 525 U.S. 182 (1999). As a consequence, Colorado's General Assembly has "the authority to adopt legislation designed to prevent fraud, mistake, or other abuses in the petition process." *Campbell*, 203 F.3d at 741 (quoting *American Constitutional Law Found.*, 120 F.3d at 1096).

Typically, the first step in determining whether a particular petition regulation crosses the line between permissible control and unconstitutional infringement is to ascertain the standard under which to evaluate it. *See Campbell*, 203 F.3d at 742. In fact, the fate of an election-related statute often "turns in large measure on whether the

regulation at issue is subject to a balancing test or strict scrutiny." *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1196-97 (10th Cir. 2000) (citing *Campbell*, 203 F.3d at 742) (alteration marks and quotation marks omitted). "Predictability of decisions in the election law arena is certainly important, but unfortunately there is no bright line separating severe from lesser burdens." *Chandler*, 292 F.3d at 1242 (quoting *Buckley*, 525 U.S. at 207 (Thomas, J., concurring in judgment)) (alteration marks omitted).

Generally speaking, whether a regulation must face a balancing test or strict scrutiny depends on the severity of the burden the regulation places on speech. "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358 (quotation marks omitted); *see American Constitutional Law Found.*, 120 F.3d at 1098 ("[T]he rigorousness of our inquiry depends upon the extent to which the challenged law burdens plaintiffs' First and Fourteenth Amendment rights.").

Where a law appears on its face to regulate the initiative process, courts should engage in a searching inquiry to determine if, in regulating the process, a state has gone too far by instituting procedures which effectively limit the underlying speech. Therefore, the essential consideration is how severe a burden a particular regulation effectively places on the underlying speech. *See Timmons*, 520 U.S. at 358.

Rules which place a significant and substantial obstacle in an initiative proponent's way face strict scrutiny. Conversely, a rule which imposes no more than an inconvenience or an insubstantial obstacle need only survive the balancing test described below. Under this analysis, an election law will face strict scrutiny where, for example, the evidence shows that it severely burdens speech due to restrictions on campaign expenditures, reductions in the available pool of circulators or other supporters, or that it seriously discourages participation by eliminating the anonymity of participants. In these cases, the state bears the burden of proving that the regulation is narrowly tailored to serve a compelling state interest.[2] *Yes On Term Limits*, 550 F.3d at 1028.

At the same time, where the evidence shows that a law regulating the initiative process does not impose a severe burden on the underlying speech it need only pass a balancing test. This is because "there is a crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed." *Initiative and Referendum Institute*, 450 F.3d at 1100. Stated otherwise, "the difficulty of the [initiative] process alone is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected." *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997) (cited by *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1100 (10th Cir.

---

[2] The state bears this burden equally at the preliminary injunction stage of a case. *See Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 429-30 (2006); *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 665-66 (2004).

2006) (en banc)); *see also Burdick v. Takushi*, 504 U.S. 428, 432-33 (1992) (quoted by *Campbell*, 203 F.3d at 743) ("Petitioner proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. . . . [T]o subject every voting regulation to strict scrutiny . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently.").

Under the balancing test, a court must balance "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" with "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Campbell*, 203 F.3d at 742-43 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Timmons*, 520 U.S. at 358; *Burdick*, 504 U.S. at 434. The Court must evaluate "the legitimacy and strength" of each of the State's purported interests; however, in doing so, the Court "also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Campbell*, 203 F.3d at 743 (quoting *Anderson*, 460 U.S. at 789); *see also Timmons*, 520 U.S. at 358; *Burdick*, 504 U.S. at 434. Although "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions," *Timmons*, 520 U.S. at 358, that determination is not automatic.

### 3.  *Severity of the Burden Imposed by § 1-40-112(4)*

As discussed above, the law presently at issue states that "[i]t shall be unlawful for any person to pay a circulator more than twenty percent of his or her compensation for circulating petitions on a per signature or petition section basis." Colo. Rev. Stat. § 1-40-112(4) (2010). Plaintiffs argue that this provision "substantially burdens Plaintiffs'

20

First Amendment right to engage in core political speech by partially banning payments to petition circulators, thereby removing incentives for the gathering of valid petition signatures while substantially increasing the cost."  PLS.' Br. in Supp. of Mot. for Preliminary Inj. [Docket No. 16] ("Pl.'s Br.") at 6.  Plaintiffs further contend that "[p]ay bans, whether outright or partial, further discourage experienced circulators, who are unlikely to work for hourly wages payable under the Act, resulting in *decreased* signature validity rates."  Pl.'s Br. at 7 (emphasis in original).  The end result, according to plaintiffs is that "[i]f not enjoined, the Act will limit Plaintiffs' ability to circulate ballot measures and to obtain the number of valid signatures (76,047) necessary to place initiatives on the November 2010 ballot."  Pl.'s Br. at 6.

In previous cases involving First Amendment challenges to election laws, courts have invalidated laws which severely burdened a proponent's speech by limiting "the available pool of circulators or other supporters of a candidate or initiative . . . ." *Chandler*, 292 F.3d at 1242 (quoting *Campbell*, 203 F.3d at 745) (omission marks in original); *see also Timmons*, 520 U.S. at 358.  Such a limitation potentially "restricts political expression in two ways: First, it limits the number of voices who will convey [the proponents'] message and the hours they can speak and, therefore, limits the size of the audience they can reach.  Second, it makes it less likely that [the proponents] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 422-23.

The first sort of restriction mentioned in *Meyer* is a restriction on the means by which an initiative proponent's message may be conveyed. In *Meyer*, as here, the "means" consists of signature gatherers. "Circulators play an important role in ballot issue elections – they are solely responsible for gathering the number and type of signatures required to place an issue on the ballot." *American Constitutional Law Found.,* 120 F.3d at 1099. Undoubtedly, this understanding of the importance of petition circulators has prompted courts to apply strict scrutiny where an election law singles out and prevents certain individuals from participating in the circulation of petitions. *See, e.g.*, *Buckley*, 525 U.S. at 192-98 (exclusion of circulators not registered to vote); *Meyer*, 486 U.S. 414 (exclusion of all paid circulators); *Yes On Term Limits*, 550 F.3d 1023 (exclusion of out-of-state circulators); *Chandler*, 292 F.3d 1236 (exclusion of circulators that were not residents of city); *American Constitutional Law Found.*, 120 F.3d 1092 (exclusion of circulators not registered to vote); *but cf. American Constitutional Law Found.*, 120 F.3d at 1101 (strict scrutiny not applied to exclusion of circulators under the age of eighteen in part because it was a temporary disability).

In each of the cases cited above, the laws at issue imposed clear, categorical limitations on the type of circulators allowed to engage in signature gathering. Section § 1-40-112(4) is not so clearly categorical because, rather than banning pay-per-signature compensation of circulators, it merely caps such compensation at 20%. However, as noted in the findings of fact, the State presented no evidence demonstrating that the effect of the 20% provision would be any different than an outright ban on pay-per-signature compensation. Therefore, the rule acts to exclude

the group of individuals who will work only on a payment-per-signature basis. According to the record, included in this group are most professional circulators. Thus, the Court will now consider those cases which have examined laws banning pay-per-signature compensation of circulators.

In *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008), the Sixth Circuit held that an Ohio law which only allowed signature gatherers to be paid based on time worked violated the First Amendment. The Sixth Circuit relied on two key facts: "(1) that Ohio's per-time-only requirement would make proposing and qualifying initiatives more expensive; and (2) that professional coordinators and circulators would likely not work under a per-time-only system." *Deters*, 518 F.3d at 385. Based upon these facts, the Sixth Circuit distinguished cases from three other circuits which upheld restrictions on pay-per-signature methods of compensation. *Deters*, 518 F.3d at 385-86 (discussing *Person v. New York State Bd. of Elections*, 467 F.3d 141 (2d Cir. 2006); *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006); *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001)). The distinctions drawn by the Sixth Circuit between Ohio's law and the laws from the three other states were: (1) rather than just prohibiting pay-per-signature compensation, Ohio foreclosed all other means of making payment; (2) Ohio's law had the apparent consequence of preventing petition organizers from paying any bonuses or terminating unproductive employees; and (3) rather than imposing misdemeanor criminal penalties or civil fines for a violation, a violation of the Ohio law constituted a felony offense. *Deters*, 518 F.3d at 385-86. The court in *Deters* applied strict scrutiny, but decided to do so because, "[w]ith the broader

ban on the types of payment and harsher criminal sanctions for violations, Ohio's provision lies closer to the complete ban in *Meyer* than the partial bans in the other circuit court cases." *Deters*, 518 F.3d at 386. Accordingly, the Sixth Circuit confined its holding to the following: "when [petitioners'] means are limited to volunteers and to paid hourly workers who cannot be rewarded for being productive and arguably cannot be punished for being unproductive, they carry a significant burden in exercising their right to core political speech," which must meet strict scrutiny. *Deters*, 518 F.3d at 386-87.

In addition to *Deters*, some federal district courts have determined that bans on payments-per-signature were subject to and failed strict scrutiny. *See Idaho Coal. United for Bears v. Cenarrusa,* 234 F. Supp. 2d 1159, 1165-66 (D. Idaho 2001); *On Our Terms '97 PAC v. Secretary of State of Me.*, 101 F. Supp. 2d 19, 25-26 (D. Me. 1999); *Term Limits Leadership Council, Inc. v. Clark*, 984 F. Supp. 470, 471-74 (S. D. Miss. 1997); *LIMIT v. Maleng*, 874 F. Supp. 1138, 1140-41 (W.D. Wash. 1994). These decisions turned in large part on the fact that, while the defendants in those cases offered minimal, if any, proof that the integrity of their voting systems was improved by the bans, the opponents presented sufficient evidence of a severe burden.[3]

The failure of proof is a common theme in the cases on pay-per-signature petition circulating, as demonstrated by the three appellate cases which have upheld bans on paying petition circulators on a per-signature basis. *Person*, 467 F.3d 141; *Prete*, 438 F.3d 949; *Jaeger*, 241 F.3d 614. The Eighth Circuit decided the first of

---

[3] The court in *LIMIT v. Maleng* also based its ruling on the fact that it equated the pay-per-signature ban to limitations on campaign expenditures. 874 F. Supp. at 1141 (citing *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981); *First National Bank v. Bellotti*, 435 U.S. 765 (1978)).

these cases, *Jaeger*.  The court's decision to uphold a pay-per-signature limitation was based in large part on the fact that the measure's opponents "produced no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures.  The appellants have only offered bare assertions on this point."  *Jaeger*, 241 F.3d 618.  On the other hand, after "[e]xamining the record in this case, [the court] conclude[d] that the State ha[d] produced sufficient evidence that the regulation [was] necessary to insure the integrity of the initiative process."  *Jaeger*, 241 F.3d 618.

The Ninth Circuit in *Prete* noted a similar lack of evidence of any burden on plaintiffs in upholding Oregon's Measure 26, which prohibits payment of petition circulators on a per-signature basis.  The Ninth Circuit affirmed "the district court's conclusion that plaintiffs did not prove Measure 26 'caused a reduction in the number of available circulators or otherwise limit[ed] the size of plaintiff's audience.'"  *Prete*, 438 F.3d at 965.  The court also affirmed the district court's finding that Measure 26 did not substantially increase the cost of petition circulation.  *Prete*, 438 F.3d at 965-66. According to the Ninth Circuit "the district court largely found that plaintiffs, through their own offer of proof, did not prove that Measure 26 would impose such a burden."  *Prete*, 438 F.3d at 965 n.21.

Finally, in *Person*, the Second Circuit upheld a New York law which prohibited per-signature payment of those employed to circulate election petitions.  *Person*, 467 F.3d at 143.  The court "join[ed] the Eighth and Ninth Circuits in holding that a state law prohibiting the payment of electoral petition signature gatherers on a per-signature

basis does not per se violate the First or Fourteenth Amendments." *Person*, 467 F.3d at 143. It then explained that "[l]ike our sister circuits, we find the record presented to us provides insufficient support for a claim that the ban on per-signature payment is akin to the complete prohibition on paying petition circulators that was deemed unconstitutional in *Meyer*, or that the alternative methods of payment it leaves available are insufficient." *Person*, 467 F.3d at 143. The court in *Person* was not persuaded by the plaintiff's "argument that per-signature payment is, from a business perspective, the best incentive to campaign workers . . . ." *Person*, 467 F.3d at 143.

Colorado's § 1-40-112(4) is closer in character to the laws upheld by *Person*, *Prete,* and *Jaeger* than it is to the Ohio law which failed strict scrutiny in *Deters*. However, the evidence presented in this case is closer to that in *Deters*, *On Our Terms '97 PAC, LIMIT*, *Idaho Coalition United for Bears*, and *Term Limits Leadership Council* in the sense that plaintiffs have shown burdens on speech that the State has failed to justify. The evidence here is uncontroverted that very few professional signature gatherers will work in Colorado on an hourly basis and, as a result, § 1-40-112(4) deters most of the professional signature gatherers from working in Colorado. While this does not necessarily lead to a direct increase in the cost per signature, it does eliminate a group of signature gatherers who are best able to collect a large number of signatures in a short amount of time. This fact will make it more difficult, at least for some initiative proponents, to get their initiative or referendum on the ballot. The evidence in the record also establishes that the effect of § 1-40-112(4) will be to raise the cost per signature for a ballot petition campaign by at least 6% to 18% and potentially as much

as a dollar per signature.  The effect will be to limit the number of signature gatherers an initiative proponent can employ, or the number of hours that signature gatherers can be paid to work, and thereby to reduce the ability of an initiative proponent to spread his or her political message.

Based on the evidence presented at the hearing, the Court concludes that § 1-40-112(4) imposes a severe burden on petition proponents and thus strict scrutiny applies.  Petition circulation is "core political speech."  *Myer*, 486 U.S. at 422.  As a result, First Amendment protection is "at its zenith."  *Yes on Term Limits*, 550 F.3d at 1028 (quoting *Chandler*, 292 F.3d at 1241).  As the Tenth Circuit recently stated, "strict scrutiny applies 'where the government restricts the overall quantum of speech available to the election or voting process . . . [such as] where the quantum of speech is limited due to restrictions on . . . the available pool of circulators or other supporters of a candidate or initiative.'" *Yes on Term Limits*, 550 F.3d at 1028 (quoting *Campbell v. Buckley*, 203 F.3d at 745) (alterations and omissions in original).  Like the ban on all paid signatures in *Meyer*, § 1-40-112(4) "limits the number of voices who will convey [the proponents'] message . . . and, therefore, limits the size of the audience they can reach.  Second, it makes it less likely that [the proponents] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."  486 U.S. at 422-23.

By raising the cost of gathering signatures, § 1-40-112(4) limits the overall quantum of speech available to the petition process by decreasing the efficiency of signature gathering.  Moreover, by imposing a restriction which has the effect of

banning pay-per-signature compensation, § 1-40-112(4) burdens speech by effectively eliminating an "available pool of circulators," namely, the professional signature gatherers who, through experience and self-selection, are the most efficient and effective signature gatherers.

### 4. Applying Strict Scrutiny to § 1-40-112(4)

To survive strict scrutiny, the State has the burden of proving that § 1-40-112(4) is narrowly tailored to serve a compelling state interest. *Yes on Term Limits*, 550 F.3d at 1028 (citing *Republican Party of Minn. v. White*, 536 U.S. 765, 774-75). As the Supreme Court has noted, "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *American Constitutional Law Found.*, 525 U.S. at 191. The State justifies § 1-40-112(4) for the reasons stated in H.B. 1326's legislative declaration, namely, the problems of fraud and signature invalidity. While the State potentially limited its argument to just signature invalidity during the June 2, 2010 hearing,[4] the Court evaluates both interests for the sake of the present motion.

Both fraud and invalidity that arise out of signature gathering bear on the integrity of the initiative process, and "[a] state has a strong, often compelling, interest in preserving the integrity of its electoral system." *American Constitutional Law Found.*,

---

[4] The legislative findings in H.B. 1326 regarding fraud are not specific to pay-per-signature compensation, *see* Colo. Rev. Stat. § 1-40-101(2)(a)(I) (2010), and, based on the evidence presented at the hearing, are not more prevalent with pay-per-signature compensation. The legislative finding specific to the pay-per-signature method relates to invalidity: "The per signature compensation system used by many petition entities provides an incentive for circulators to collect as many signatures as possible, without regard for whether all petition signers are registered electors." Colo. Rev. Stat. § 1-40-101(2)(a)(II) (2010).

120 F.3d at 1099 (citing *Timmons*, 520 U.S. 351). While there is not much evidence in the record of problems with invalidity, beyond a disagreement about whether certain circulators lived where they said they did on their affidavits, the Court finds that the State has met its burden in identifying a compelling state interest in the avoidance of fraud and invalid signatures. Where the State fails in this analysis, however, is in proving how these interests make it necessary to burden the plaintiffs' ability to gather signatures though § 1-40-112(4).

The goal of paid signature gathering from the perspective of the ballot initiative proponent is presumably economic efficiency, that is, acquisition of the most signatures at the lowest cost. The testimony in this case demonstrates that petition gathering firms, whether they use pay-per-signature or pay-per-hour models, all attempt to motivate signature gatherers to do their jobs well. Blaszak testified that in order to motivate his signature gatherers he employs everything from peer pressure, to higher salaries, to special bonuses. The motivation under the pay-per-signature model is based on a simple calculus: the more signatures gathered, the greater the compensation. The evidence also demonstrates that, as a result of the incentives built into each model, some segment of signature gatherers will apparently commit fraud. Blaszak, as well the owners of pay-per-signature-based companies, such as Lamm, testified that they have refused petition sections which appeared to be the product of fraud. Furthermore, there was testimony that complaints about and prosecutions of fraud have taken place under both models. In fact, at least one complaint of fraud referenced in the record was lodged against a volunteer. Therefore, what can be

deduced from this evidence is that some individuals will be prone to committing fraud and that the compensation model has not been proven to be the overriding motivation.

The State also relies on the intuitive argument that those paid by the signature want more signatures so are more likely to induce fraud or the carelessness that results in invalidity. However, this argument has little support, particularly in light of the evidence that § 1-40-112(4) eliminates the availability of the professional signature gatherers who no witness alleges are the source of the fraud and who, it has been recognized, have a greater reputational interest in avoiding fraud and invalidity. *See Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1029 (10th Cir. 2008) (quoting *Meyer*, 486 U.S. at 426 ("We are not prepared to assume that a professional circulator – whose qualifications for similar future assignments may well depend on a reputation for competence and integrity – is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot.") (alteration marks omitted)).

The person who has the best information based on research, Dr. Smith, testified that pay-per-signature compensation does not necessarily lead to more fraud. The State offered no evidence that, as a class, *see Yes on Term Limits*, 550 F.3d at 1030-31, circulators paid by the signature have higher invalidity rates. The State admitted as much during argument on June 2, 2010 when it was unable to identify any evidence demonstrating that fraud and invalidity rates improve where pay-per-signature is restricted.

In attempting to provide evidentiary support for how the pay-per-signature restrictions in § 1-40-112(4) further a compelling state interest, the State relies most

heavily on the legislative findings in H.B. 1326, to which it asks the Court to give deference. *See* Secretary's Br. in Opp'n to PLS.' Mot. for Prelim. Inj. [Docket No. 22] at 8 (citing *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1165 (10th Cir. 2006)). "The factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (citing *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488-489 (1955)); *see also Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 212 (1997) (Courts "are not at liberty to substitute our judgment for the reasonable conclusion of a legislative body."). However, "[d]eference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843 (1978); *see Gonzales v. Carhart*, 550 U.S. 124, 165 (2007) ("[A]lthough we review congressional factfinding under a deferential standard, we do not in the circumstances here place dispositive weight on Congress' findings. The Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake."); *Crowell v. Benson*, 285 U.S. 22, 60 (1932) ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function."). Even the case cited by the State does not suggest blind reliance on legislative declarations. *See Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1165 (10th Cir. 2006) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1199 (10th Cir. 2003)) ("If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating

that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.").

There is no evidence here that the legislative declarations as they pertain to § 1-40-112(4) are properly rooted in actual facts. The legislative findings make an intuitive leap from the fact that fraud, invalidity, and per-signature payments co-existed in Colorado in the 2008 election cycle to conclude that the payment method caused the first two problems. However, the record contains no evidence of such a causal connection. In the absence of such a connection, the Court is not required to pay deference to the legislative findings regarding H.B. 1326.

In the context of strict scrutiny analysis, courts regularly evaluate whether a law is narrowly tailored by considering whether there are less restrictive means by which the state could achieve the same result. *See, e.g.*, *Yes On Term Limits*, 550 F.3d at 1029-31 ("Oklahoma has failed to prove that banning all non-resident circulators is a narrowly tailored means of meeting its compelling interest. Oklahoma has also failed to prove the ineffectiveness of plausible alternatives to the blanket ban on non-residents. Oklahoma's ban on non-resident circulators therefore violates the First and Fourteenth Amendments of the United States Constitution."); *see also American Constitutional Law Found.*, 120 F.3d at 1100, 1105. Here, the State has failed to show that § 1-40-112(4) is narrowly tailored to meet its compelling interest. Not only, as discussed above, is the

effectiveness of § 1-40-112(4) at achieving its stated goals unproven, but more effective alternatives exist which would be less burdensome on speech.

Courts have noted that criminal penalties can be a narrowly-tailored means of protecting the integrity of the voting system. *See Yes On Term Limits*, 550 F.3d at 1030. In fact, Colorado has several criminal measures in place aimed at doing just that: "It is a crime to forge a signature on a petition, to make false or misleading statements relating to a petition, or to pay someone to sign a petition." *Meyer*, 486 U.S. at 427 (citations omitted); *see* Colo. Rev. Stat. § 1-40-130 (2010) (listing unlawful acts and penalties relevant to initiatives and referenda). Nevertheless, very few resources have been devoted to enforcing such laws and very few prosecutions have taken place. Wayne Munster, the deputy director of elections for the Colorado Secretary of State, testified that their current practice – investigating very few verbal complaints, referring written complaints to an administrative law judge, and engaging in no self-initiated investigations – has resulted in very few prosecutions. It is reasonable to conclude that more enforcement would lead to more deterrence of fraud and therefore less fraud in the ballot initiative process. Enforcement of such laws would be a more narrowly-tailored means of meeting the State's compelling interest. Without evidence that such enforcement would itself be ineffective, the First Amendment will not allow the State to rely on the broader and more burdensome alternative in § 1-40-112(4).

As for invalidity rates, neither side discussed alternative means to decreasing these rates, although several exist in Colorado's election laws. *See, e.g.*, Colo. Rev. Stat. § 1-40-111 (2010) (circulator affidavit); Colo. Rev. Stat. § 1-40-112(3) (2010) (training); Colo. Rev. Stat. § 1-40-116 (2010) (random sampling). However, given the

33

previously-discussed lack of causal connection between § 1-40-112(4) and improved validity rates, the Court concludes that the State has failed to prove that the law is narrowly tailored to serve a compelling state interest.

### 5. The Balancing Test

Even if the Court did not apply strict scrutiny to § 1-40-114(2), it could not survive the lesser scrutiny of the balancing test. It has been said that, under this lesser form of scrutiny, a "State's asserted regulatory interests need only be 'sufficiently weighty to justify the limitation' imposed on the Plaintiffs' rights." *American Constitutional Law Found.*, 120 F.3d at 1098 (quoting *Timmons*, 520 U.S. at 364) (alteration marks omitted). "Our inquiry does not require 'elaborate, empirical verification of weightiness' of the State's asserted justifications." *American Constitutional Law Found.*, 120 F.3d at 1098 (10th Cir. 1997) (quoting *Timmons*, 520 U.S. at 364) (alteration marks omitted). However, although states may forgo "elaborate, empirical verification of weightiness," they may not forgo any verification whatsoever.

In applying the balancing test, the Court's first task is to identify "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Campbell*, 203 F.3d at 742-43. The discussion thus far has identified these as the increased costs and time § 1-40-112(4)'s restrictions on payments per signature impose on initiative proponents and the consequential decrease in the likelihood of success of these endeavors. There also exists the added risk and uncertainty imposed on the initiative and referendum process

by § 1-40-112(4) which has significantly discouraged plaintiffs and others from participating in the process.

The next step in the balancing test is to determine "the precise interests put forward by the State as justifications for the burden imposed by its rule," "the legitimacy and strength" of each of the State's purported interests, and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Campbell*, 203 F.3d at 743. The Court recognizes that the State has legitimate and strong interests in protecting the integrity of its electoral system and that preventing fraud and invalidity in the signature gathering process serves that interest. However, because there is no evidence that restricting per-signature compensation of petition circulators prevents fraud or reduces invalidity rates, the State has failed to demonstrate that its interests make it necessary to burden the plaintiff's rights in the way that § 1-40-112(4) has. As a result, even if the burden imposed by § 1-40-112(4) is not severe, the law does not withstand constitutional scrutiny under the balancing test.

### C. Likelihood of Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted). "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003). "The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

In the present case, it does not appear that most of the plaintiffs will suffer any irreparable constitutional harm between now and the time of trial. The two notable exceptions are plaintiffs Caldara and Tvert. Both have petitions that the Secretary of State's office has approved but which they must now gather signatures in support of to be included on the November 2010 ballot. The deadline is either July 12, 2010 or August 2, 2010. Caldara and Tvert contend that they cannot afford to circulate the petitions to acquire the necessary signatures because of the added costs imposed by § 1-40-112(4). Therefore, there is a likelihood that they will suffer irreparable harm in the absence of a preliminary injunction.

### D.  Balance of the Equities

On the one hand, the State has "a strong, often compelling, interest in preserving the integrity of its electoral system." *American Constitutional Law Found.*, 120 F.3d at 1099. The defense of this interest requires that the initiative process be conducted in an orderly, accurate, and fraud-free manner. However, because, as discussed above, the State has been unable to provide any evidence that § 1-40-112(4) serves these interests, there is little in the way of equitable force behind the State's position.

On the other hand, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. Federal Election Comm'n*, --- U.S. ----, 130 S. Ct. 876, 898 (2010). Plaintiffs have a fundamental interest in being able to express their desire for political change and

actively work toward achieving that goal through the ballot initiative process that the Colorado Constitution has provided. "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence" and "First Amendment standards . . . must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United*, 130 S. Ct. at 891, 898 (quotation marks omitted). Therefore, the equities tilt heavily in plaintiffs' favor.

### E.  The Public Interest

Due to the nature of the statutes at issue, the public interest and the balance of equities factors significantly overlap. For the same reasons discussed under the balance of equities, the public interest favors plaintiffs on their fifth claim for relief.

### F.  Relief

Plaintiffs Caldara and Tvert have met their burden in demonstrating that: (1) they have a likelihood of success on the merits; (2) there is a likelihood that they will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) the injunction is in the public interest. As a result, they are entitled to a preliminary injunction enjoining the enforcement of Colorado Revised Statutes § 1-40-112(4) as requested in claim five of their second amended complaint. They are also entitled to a preliminary injunction of any ancillary statute which enforces § 1-40-112(4). Specifically, Colorado Revised Statutes § 1-40-135 or § 1-40-121 may not be enforced to the extent that those sections apply to the restriction on per-signature compensation found in § 1-40-112(4).

## IV.  CONCLUSION

Based on the foregoing, it is

**ORDERED** that, pursuant to Federal Rule of Civil Procedure 65, plaintiffs' motion for preliminary injunction [Docket No. 15] is GRANTED in part and ruling is RESERVED in part.  Defendant Bernie Buescher is ENJOINED AND RESTRAINED from enforcing Colorado Revised Statutes § 1-40-112(4) or any ancillary provision which enforces Colorado Revised Statutes § 1-40-112(4).  It is further

**ORDERED** that this preliminary injunction shall apply to the following individuals who receive actual notice of it by personal service or otherwise: Defendant Buescher's officers, agents, servants, employees, and attorneys; other persons who are in active concert or participation with defendant Buescher or with his officers, agents, servants, employees, or attorneys.  It is further

**ORDERED** that this preliminary injunction shall remain in effect until the conclusion of a trial on the merits in this case or until otherwise amended by the Court. It is further

**ORDERED** that, given the nature of the injunction in this order and the difficulty in quantifying an amount of potential costs and damages should it later be determined that any party is wrongfully enjoined or restrained under this order, the Court will not require the plaintiffs to post a bond pursuant to Fed. R. Civ. P. 65(c).

DATED June 11, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge