IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-00609-PAB-MEH

THE INDEPENDENCE INSTITUTE, *et al*.

    Plaintiffs,

v.

SCOTT GESSLER, in his official capacity as Colorado Secretary of State,

    Defendant.

_____

## ORDER
_____

In 2009, the Colorado General Assembly passed and the Governor signed into law House Bill 09-1326 ("H.B. 1326"), which amended rules and procedures dealing with the initiative and referendum processes in Colorado. Plaintiffs, persons involved in the initiative and referendum process in Colorado, filed this lawsuit challenging several aspects of H.B. 1326. *See* Docket No. 1. Specifically, plaintiffs assert ten claims for relief – nine alleging a violation of the First Amendment's protection of the exercise of free speech and one claim alleging both a violation of free speech and a violation of the Due Process Clause of the Fourteenth Amendment. *See id.*

This matter is presently before the Court on the Motion to Exclude Testimony of Brandon Holmes [Docket No. 171] filed by defendant Scott Gessler in his official capacity as the Secretary of State for the State of Colorado. Defendant requests that the Court exclude testimony from Brandon Holmes, plaintiff's expert on grass roots

organizing and direct democracy, pursuant to Rule 702 of the Federal Rules of Evidence. The motion is fully briefed and ripe for resolution.

## I. FEDERAL RULE OF EVIDENCE 702

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the specific proffered opinions must be assessed for reliability. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To execute that function, the Court must "assess the reasoning and methodology underlying the

expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).

Although it is not always a straightforward exercise to disaggregate an expert's method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert*, 509 U.S. at 597. It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness' opinions must demonstrate that the process by which the witness derived his or her opinions is reliable. *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008). When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). These considerations are not exhaustive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining

whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

While the proponents of the challenged testimony have the burden of establishing admissibility, their proffer is tested against the standard of reliability, not correctness; they need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008).

In sum, expert testimony must be excluded if the expert is unqualified to render an opinion of the type proffered, if the opinion is unreliable, if the opinion will not assist the trier of fact, or if the opinion is irrelevant to a material issue in the case.

## II. THE HOLMES REPORT

Mr. Holmes' expert report is based on a study he prepared for Citizens in Charge Foundation, a national organization dedicated to direct democracy, entitled "*Is the 'F-Word' Overused?*" *See* Docket No. 171-3. Mr. Holmes' study sought to assess the amount of verified fraud reported in the 26 states where citizens have a right to place initiatives or referendums on a statewide ballot. *Id*. at 3. The study focused on verified fraud–when a person accused of signature fraud is convicted of forgery or fraud–in an attempt to distinguish between actual fraud and alleged fraud. *Id*.

In order to determine the prevalence of verified fraud, Mr. Holmes filed open records and freedom of information requests with the Secretaries of State and Attorneys General of the 26 states that allow statewide ballot initiatives. *Id.* at 7. The requests sought:

> a copy of records of any and all instances in which your office and a court of law have verified forgery or fraud of signatures submitted for initiatives and referenda between 1999-2008 . . . [as well as the] total [number of] signatures for initiatives and referenda [] submitted for each year during the same time period.

*Id.* at 6. The open records request also asked that, if the Secretaries of State and the Attorneys General of the 26 states did not maintain these public records, they identify the name and address of the custodian of these records. *Id.*

Mr. Holmes' requests gathered election data from 2000, 2002, 2004, 2006 and 2008. *Id.* at 7. Twenty of the twenty-six states responded to the open records requests with 46 of the 52 offices solicited providing information. *Id.* Mr. Holmes' study found that, between 1999 and 2008, there were 17 cases of reported convictions for fraud or forgery that occurred in five states–Idaho, Maine, Ohio, Nebraska, and North Dakota. *Id.* at 5. During the study's ten-year span, there were 81,635,847 petition signatures submitted to election officials and 15 of 20 states reported no instances of verified fraud. *Id.* at 8.

Accordingly, with a national average of 1.7 cases per year of individuals convicted for fraud or forgery while petitioning for initiatives or referendums, Mr. Holmes concluded that there was a widespread lack of signature fraud. *Id.* at 7. Mr. Holmes reasoned that, with most states reporting no cases of verified fraud or forgery, it

"seem[ed] clear that the [word fraud] has been overused." *Id*. at 8. Mr. Holmes also opined that, because legislative measures do little to reduce verified fraud, enforcing existing laws against fraud and forgery is a far more effective approach than enacting new legislation. *Id*. at 5.

### III.  DEFENDANT'S ARGUMENTS

Defendant challenges two of Mr. Holmes' opinions. First, defendant challenges the opinion that there is a widespread lack of signature fraud in the ballot initiative and referendum process, and second, the opinion that better enforcement of Colorado's existing laws would adequately prevent signature fraud. Docket No. 171 at 1-2. Defendant argues that the Court should exclude these opinions because Mr. Holmes used unreliable techniques and methodologies to arrive at these conclusions. *Id*. at 6.

Defendant also argues that the Court should exclude Mr. Holmes' testimony because he is not qualified to provide expert opinion on the topic of "grass roots organizing and direct democracy rights," Docket No. 171 at 1, which defendant says is Mr. Holmes' claimed area of expertise. Defendant states that Mr. Holmes has not published any peer-reviewed articles, has no training in data compilation, statistics, or any other fields of inquiry relevant to his report. *Id*. at 3. Defendant further contends that, despite working for Citizens in Charge Foundation for over two years, Mr. Holmes' only relevant experience with grass roots organizing began in March 2010, which was four months before he issued his expert report in this case. *Id*. at 5. Defendant claims that such limited experience does not qualify Mr. Holmes as an expert in grass roots organizing and direct democracy. *Id*.

With regard to Mr. Holmes' opinion that there is no widespread fraud in signature gathering, defendant states that Mr. Holmes' study is seriously flawed because there is no support for the proposition that convictions are a reliable indicator of the amount of signature fraud. *Id*. at 8. Defendant asserts that conviction rates may not be an appropriate proxy because prosecutors often refuse to pursue claims of alleged signature fraud and a focus on convictions does not account for pending investigations of alleged fraud, nor does it account for instances where a plea bargain short of conviction is offered and accepted by a guilty party. *Id*. Moreover, defendant argues that the report is unreliable because often allegations of petition fraud are not criminally charged but are prosecuted by investigative bodies, in administrative hearings, or civil proceedings. *Id*. at 9. Accordingly, defendant argues that Mr. Holmes' methodology was seriously flawed because the scope of his data collection was too narrow. *Id*. at 11.

Defendant also argues that, even if the scope of Mr. Holmes' data collection was not too narrow, he collected an insufficient amount of data to make his findings reliable. *Id*. at 10. To prove discrepancies between the results of verified fraud in Mr. Holmes' study and the actual incidence of verified signature fraud, defendant highlights the Michigan Civil Rights Commission's findings on voter fraud as well as the reported convictions in Oregon. Docket No. 171-8 at 1-2. Defendant further contends that many of the records Mr. Holmes sought were unavailable because they were destroyed by state retention policies. Docket No. 171 at 12-13. Additionally, Mr. Holmes' data is insufficient to support his opinion of a lack of widespread fraud because he failed to

update his report with new evidence and failed to adequately follow up with the proper custodians of verified fraud in various states.  *Id*.

With regard to Mr. Holmes' second opinion–that better enforcement of Colorado's existing laws would prevent signature fraud from occurring–defendant argues that Mr. Holmes fails to provide facts, data, or an explanation of the methodology he used to arrive at this conclusion.  Docket No. 171 at 11-12.  Defendant claims that Mr. Holmes bases this opinion on his unsupported belief that, if fraud occurred, then prosecutors would convict those guilty of fraud.  *Id*.  Defendant therefore argues that Mr. Holmes' failure to explain how he arrived at this conclusion renders this opinion insufficiently reliable to qualify for admission under Rule 702.  *Id*. at 14.

In response, plaintiffs argue that Mr. Holmes' experience working for Citizens in Charge Foundation since 2008, and other organizations prior to 2008, qualifies Mr. Holmes as an expert in the field of grass roots organizing and direct democracy.  Docket No. 213 at 4.  Plaintiffs allege that Mr. Holmes has adequate training, specialized knowledge, and experience in the relevant field and that all of defendant's arguments relate to weight and not admissibility.  *Id*. at 6.

Additionally, plaintiffs claim that Mr. Holmes' opinion regarding the amount of verified signature fraud is sufficiently reliable for admissibility under Rule 702.  *Id*. at 5.  Plaintiffs argue that Mr. Holmes' report does not attempt to prove that there is widespread lack of signature fraud; rather, the report seeks to show that there is a "widespread lack of *verified* signature fraud."  *Id*.  Additionally, plaintiffs argue that the study is relevant to the litigation because it provides an "important counterpoint" to

defendant's argument that signature fraud is a common occurrence in the petitioning industry. *Id*.

Finally, plaintiffs assert that Mr. Holmes' opinion that enforcement of existing laws is a more effective deterrent to signature fraud is reliable. *Id*. In support, plaintiffs state "[w]ithout belaboring the point, many in the petitioning industry have testified that enforcement of existing laws . . . is preferable to the adoption of per-signature pay bans and other provisions which burden speech." *Id*. at 6. Plaintiffs then argue that, given Mr. Holmes' involvement in direct democracy, he is "sufficiently qualified to articulate the collective opinion of individuals within the petitioning industry." *Id.* at 7. Plaintiffs conclude by claiming that "where, as here, expert testimony is based upon experience or training and not on scientific or technical knowledge, the Court 'need not apply the *Daubert* factors to determine its reliability.'" *Id*. (citation omitted).

## IV.   ANALYSIS

The proponent of expert testimony bears the burden of proving the foundational requirements of an expert's qualifications. *Crabbe*, 556 F. Supp. 2d at 1220-21. Under a Rule 702 analysis, establishing that an expert is qualified in a particular field does not automatically lead to the admission of an expert's testimony. *Id*. at 1221. On the contrary, Rule 702 focuses on the admissibility of expert opinions and whether those opinions are reliable. *Id*. While a witness may satisfy the minimum requirements to qualify as an expert, his or her level of expertise may nevertheless affect the reliability of the expert's opinion. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Thus, even if an expert is qualified to express an opinion on a given field or

subject matter, the Court still has an independent duty to analyze whether the opinion proffered is reliable. Given this framework, the Court now determines whether plaintiffs have provided enough evidence to support each of the opinions challenged by defendant.

### A. Widespread Lack of Signature Fraud

Mr. Holmes' opinion regarding signature fraud is based on a quantitative study which involved him gathering data from multiple sources, analyzing the data, and then drawing conclusions from the data. *See* Docket No. 171-3. However, plaintiffs have not shown that Mr. Holmes has any formal training in data analysis and statistics or that he has previous experience performing similar studies. Moreover, Mr. Holmes' CV does not support a finding that he has significant experience with quantitative data analysis at Citizens in Charge Foundation. *See generally* Docket No. 171-2. To the extent Mr. Holmes relies on his experience to substitute for his lack of formal training, the Court finds that his opinion of a "widespread lack of signature fraud" does not sufficiently relate to the skills he garnered through his experience at Citizens in Charge Foundation. The Court next addresses the question of whether Mr. Holmes' opinion regarding a widespread lack of signature fraud, despite his lack of apparent qualifications, may nevertheless be admissible because such opinion is based on sufficient data or facts that are reliably applied to an accepted methodology. *See Wheeler v. John Deere Co.*, 935 F.2d 1090, 1101 (10th Cir. 1991) (lack of "specialization only affected the weight, not the admissibility.").

The Court finds that Mr. Holmes' opinion "that there is a widespread lack of verified signature fraud in the ballot initiative and referendum process" is inadmissible because it is not a justifiable conclusion from his study.  Mr. Holmes' study design assumed that criminal convictions for fraud or forgery could be used as proxies for the prevalence of signature fraud in the states that allow statewide ballot initiatives.  Docket No. 171-3 at 3.  However, when Mr. Holmes made this assumption, he did not verify whether the relevant states had statutes criminalizing signature petition fraud, nor did he research what, if any, penalties were associated with these violations.  Docket No. 171-4 at 12 (Holmes Dep. 86:12-20) ("I assumed that if states were worried about catching fraud, they would look for fraud and they would have basic laws in place").  Mr. Holmes also failed to research each state to identify the entities responsible for regulating or tracking petition signature fraud.  Instead, he filed open records requests with secretaries of state and attorneys general because he assumed that they would hold records related to signature petition fraud.  Although Mr. Holmes requested that these officers direct him to the proper state entity in charge of signature petition fraud, Mr. Holmes failed to follow up when such agencies provided unclear responses.  *See* Docket No. 171-3 at 10 (no follow up request with the State of Arizona despite "Arizona's Secretary of State indicat[ing] that any such records would be with the Attorney General, and the Attorney General indicat[ing] that if any records existed they would be with [the] Secretary of State.").

Additionally, Mr. Holmes failed to account for the possibility that certain states may have time limits on the retention of records, which could cause disparities in the amount of reported violations between states.  Docket No. 171-4 at 39 (Holmes Dep.

11

148:16-22) ("There were a few states that responded and said, for instance, that they only kept records going back to 2004 [or 2002]"). Mr. Holmes' failure to account for disparate retention rates is problematic because there is no indication that Mr. Holmes' results account for the variation between the states with regard to policies for retaining records. These flaws in Mr. Holmes' methodology undermine the ability to derive a meaningful conclusion about the collected data because it is difficult to determine what, if anything, verified signature fraud signifies.

Furthermore, Mr. Holmes' study suffers because it collected an insufficient amount of data to provide reliable results. Mr. Holmes' study results showed that several states had "fully reported" when, in reality, these states had either failed to fully comply with his open records request or they could not provide signature petition fraud results because of ongoing investigations. *See, e.g.,* Docket No. 171-3 at 10 (the State of Arizona is listed as "fully responded" although Arizona's response said "Arizona's Secretary of State indicated that any such records would be with the Attorney General, and the Attorney General indicated that if any records existed they would be with [the] Secretary of State."); *see id*. (California listed as "fully responded" though California informed Mr. Holmes that the requested records were part of an ongoing investigation and therefore did not provide the data). Additionally, of the 81,635,487 petition signatures received between 1999-2008, Mr. Holmes failed to gather information about verified signature fraud with regard to 48,882,003 petition signatures. *See id* at 10-13 (State of Arizona with 7,911,726 petition signatures; State of California with 26,541,044 petition signatures; State of Florida with 10,349,730 petition signatures; State of Massachusetts with 2,675,794 petition signatures; and State of Oklahoma with

1,403,709 petition signatures).  Given that Mr. Holmes' study fails to account for over half of the petition signatures received in the relevant time period, the Court finds that he has failed to gather "sufficient facts and data" from which to formulate a reliable opinion.  *Crabbe*, 556 F. Supp. 2d at 1223.

Accordingly, the Court finds that Mr. Holmes' opinion about a "widespread lack of verified signature fraud" is not sufficiently reliable for admission under Rule 702 because Mr. Holmes' study design suffered from significant flaws and he failed to account for over half of the petition signatures received during the relevant time period.  *See id.*

### B.  Better Enforcement of Existing Laws

The Court finds that Mr. Holmes' second opinion, that "better enforcement of Colorado's existing laws would adequately prevent signature fraud," is also inadmissible.  Plaintiffs do not assert that Mr. Holmes' second opinion is the result of any empirical research; on the contrary, plaintiffs assert that "many in the petitioning industry have testified that enforcement of existing laws" is preferable to the adoption of new laws.  Docket No. 213 at 6.  However, expert testimony does not necessarily become relevant and reliable simply because others have agreed with such testimony.  Plaintiffs have the burden of showing that Mr. Holmes' opinion in this instance is reliable, relevant, and based upon the proper application of methodology.  *Crabbe*, 556 F. Supp. 2d at 1221.  Given that plaintiffs do not argue that Mr. Holmes' second opinion is based on empirical evidence, plaintiffs cannot prove its reliability.  Moreover, Mr. Holmes' experience as a grass roots organizer and advocate of direct democracy does

not qualify him to offer an opinion regarding the link between Colorado's enforcement abilities and the prevention of signature fraud, nor does his experience somehow make such opinion sufficiently reliable.  Accordingly, Mr. Holmes' second opinion is also excluded because plaintiffs failed to satisfy the foundational requirements of Rule 702.

**V.   CONCLUSION**

Accordingly, it is

**ORDERED** that Secretary's Motion to Exclude Testimony of Brandon Holmes Pursuant to Fed. R. Civ. P. [sic] 702 [Docket No. 171] is **GRANTED**.  Pursuant to Rule 702, Mr. Holmes may not testify: (1) that there is a widespread lack of signature fraud associated with statewide ballot initiatives or referendums; and (2) that better enforcement of Colorado's existing laws would adequately prevent signature fraud.

DATED March 21, 2012.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge