IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-00609-PAB-MEH

THE INDEPENDENCE INSTITUTE, *et al*.

Plaintiffs,

v.

SCOTT GESSLER, in his official capacity as Colorado Secretary of State,

Defendant.

_____

## ORDER

_____

The Court presided over a trial to the court from May 14 to May 24, 2012.  The trial addressed one principal issue – whether the State of Colorado's limitation on per-signature compensation for petition circulators violates the First Amendment to the United States Constitution.  The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

Plaintiffs are petition circulators, non-profit organizations, and petition entities involved in the initiative and referendum process in the State of Colorado.  They filed this 42 U.S.C. § 1983 action challenging the constitutionality of House Bill 09-1326 ("H.B. 1326"), which amends the rules and procedures pertaining to the initiative and referendum processes.  On April 26, 2012, the Court granted defendant Scott Gessler's motion for summary judgment [Docket No. 327] on plaintiffs' second, third, fourth, eighth, ninth, and tenth claims for relief.  Plaintiffs' sixth and seventh claims for relief

were dismissed as moot and the Secretary stipulated to the entry of final judgment on plaintiffs' first claim for relief [Docket No. 339].  The trial to court addressed plaintiffs' only remaining claim – the fifth claim for relief, which challenges the constitutionality of Colorado's hybrid compensation scheme.

The hybrid compensation scheme is codified at Colo. Rev. Stat. § 1-40-112(4) and states as follows: "It shall be unlawful for any person to pay a circulator more than twenty percent of his or her compensation for circulating petitions on a per signature or petition section basis."  The statute does not restrict all compensation to circulators on a per-signature basis; however, as a practical matter, the twenty percent restriction limits per-signature compensation to bonuses or incentive payments.  As a result, the statute requires that circulators receive the majority of their compensation in the form of hourly payments.

Plaintiffs claim that the hybrid scheme severely infringes their First Amendment rights to free speech because it decreases the pool of professional circulators who are necessary for any successful signature-gathering campaign.  Plaintiffs also argue that the hybrid scheme increases the cost of signature-gathering efforts, making it more difficult to qualify measures for the statewide ballot.  Finally, plaintiffs assert that there is no evidence that the hybrid scheme will reduce the rate or incidence of fraud in the initiative and referendum process.  The Secretary responds that plaintiffs offer no proof that § 1-40-112(4) will actually reduce the number of available professional circulators or that the statute will increase the cost of signature-gathering efforts in Colorado.

The Court previously enjoined the Secretary from enforcing Colo. Rev. Stat. § 1-40-112(4), § 1-40-135, and § 1-40-121 to the extent that those sections applied to

the hybrid scheme.  *See* Docket No. 60 at 37.  Evidence at the preliminary injunction

hearing established that the statute would deter most professional circulators from

working in Colorado and would raise the cost of qualifying a measure for statewide

vote.  The Court also found that the Secretary failed to establish that pay-per-signature

compensation was connected to the likelihood of circulator fraud.  *Id*. at 29-30.

The evidence and arguments presented at trial established the following:

### A.  The Initiative and Referendum Process

The constitution of the State of Colorado permits its citizens to place propositions

on the ballot through the initiative process.  Colo. Const. Art. V, § 1.  Proponents of a

measure have two years to qualify an issue for the ballot, but may only propose

Taxpayer's Bill of Rights[1] measures – issues pertaining to taxes – for statewide vote in

odd years.

To qualify a measure, proponents must complete the statutorily mandated

process as set forth in Colo. Rev. Stat. § 1-40-101 *et seq*.  Proponents must first submit

a draft of the proposed legislation to the Legislative Counsel Office for review and

comment.  Colo. Rev. Stat. § 1-40-105(1).  Following a public hearing, the draft is

submitted to the Title Board, to designates a title (the measure's title cannot mislead or

confuse voters) and a submission clause (paragraph summarizing the proposed

legislation).  Colo. Rev. Stat. § 1-40-106.  Once the petition title and the submission

---

[1]The Colorado Taxpayer's Bill of Rights, Colo. Const. art. X, § 20, is a constitutional amendment approved by Colorado voters during the 1992 general election. *Huber v. Colo. Mining Ass'n*, 264 P.3d 884, 886 (Colo. 2011).  The amendment requires, among other things, that governmental entities obtain voter approval before imposing any tax increases or extending tax legislation set to expire. *Id*.

clause are set, proponents must provide the Secretary with a sample petition section which contains a circulator affidavit,[2] the ballot title, and the submission clause as approved by the Title Board.  Thereafter, the Secretary must endorse a sample petition section and proponents may provide sequential copies of the petition section for circulation.  Finally, proponents need to complete the circulation process in a six-month period, wherein they must collect the requisite number of valid signatures[3] to present to the Secretary for review.[4]  The signature-gathering process is the matter at issue in this case.

## B.   Section 1-40-112(4)'s Effect on the Cost of Signature-Gathering

### 1.  Pay-Per-Signature vs. Hybrid Compensation

The testimony from both sides established that the effect of § 1-40-112(4) is to raise the per-signature cost to a petition entity.  The cost of running signature-gathering

---

[2]Circulators are required by law to sign an affidavit in the presence of a notary attesting, among other things, that they witnessed every signature in the petition section, that they individually circulated the petition, that every signature in the petition is from a registered voter, and that they understand Colorado law.  Colo. Rev. Stat. § 1-40-111(1); see also Ex. C-97 (all citations to exhibits in this Order are to exhibits admitted at trial).

[3] The statute requires that the petition signatures collected must be from electors who are registered to vote in Colorado.  Colo. Rev. Stat. § 1-40-111(1).  The Secretary does not count signatures if the name on the petition section is not found in the voter registration database.  The Secretary also does not count signatures if the registered voter's name is found in the voter registration database, but the address provided in the petition section does not match the address in the database.  Colo. Rev. Stat. § 1-40-116(3).

[4]The number of valid signatures required must be in an amount equal to at least five percent of the total number of votes cast for all candidates for the Office of Secretary of State during the last preceding general election.  The amount of valid signatures required in 2012 was 86,105; this number was 76,047 for both the 2010 and 2008 election cycles.

campaigns will increase because the hybrid scheme excludes some professional circulators from working in Colorado and makes the signature-gathering process significantly less efficient.  The evidence, however, did not provide an easily determinable method to quantify that increase in costs.

### a.  Pool of Circulators

At the preliminary injunction hearing, the Court found that petition entities[5] in Colorado rely on a group of itinerant professional circulators[6] to perform signature-gathering activities.  Docket No. 60 at 7.  Testimony from the preliminary injunction hearing established that itinerant professional circulators are integral to signature-gathering campaigns because they (1) are able to gather a large number of signatures in a short amount of time, (2) do not require training because they are familiar with the laws of various states, and (3) are easy to locate.  *Id*. at 6.  The testimony at trial, however, demonstrated that petition entities are not so dependent on professional circulators, but instead rely on a variety of circulators during signature-gathering campaigns.  Dan Kennedy, owner of Kennedy Enterprises LLC, a petition entity in Colorado, testified that petition entities typically rely on three types of circulators: (1) low-volume but high-validity professionals[7] (i.e. individuals who

---

[5]Petition entities are defined as "any person or issue committee that provides compensation to a circulator to circulate a ballot petition."  Colo. Rev. Stat. § 1-40-135(1).  Petition entities are the primary signature gatherers in Colorado, with five petition entities currently operating in the State.

[6]Circulators are individuals who carry petitions and attempt to persuade registered voters to sign a petition section.

[7]The testimony sometimes referred to these circulators as low-volume but high-validity.  This Order will refer to the low-volume but high-validity professionals as

occasionally circulate petitions for additional income); (2) medium-volume professionals (i.e. individuals who circulate on a part-time basis and produce an hourly average of 15 to 30 signatures); and (3) high-volume itinerant professionals (i.e. individuals who rely on signature-gathering campaigns for their primary income and travel between states in search of the best compensation).[8]

Jon Caldara, president of plaintiff The Independence Institute,[9] testified that his 2010 Healthcare Choice measure would not have qualified for the statewide ballot without professional circulators.  Caldara stated that, between April 2010 and August 2010, his all-volunteer signature-gathering effort yielded just 20,000 signatures.[10]  Only after this Court enjoined § 1-40-112(4) and he retained Kennedy Enterprises to enlist professional circulators was his signature-gathering campaign able to collect the necessary 110,676 signatures.[11]  *See* Ex. B-43 at 9.  Kennedy estimated that 40% of

low-volume professional circulators.

[8]During the trial, witnesses sometimes referred to the itinerant professionals as "nomads."  This Order will refer to these individuals as "itinerant professionals."

[9]The Independence Institute is a think tank whose mission is to promote public policies that enhance personal and economic freedom.

[10]Michael Arno, the owner of a petition entity in California, knew of only one instance of a successful all volunteer effort in the 1980s.  The volunteer effort was to pass a measure to protect the California mountain lion and its habitat.  The measure was so popular that it barely faced opposition.  *See Outfitter Props., LLC v. Wildlife Conservation Bd.*, 207 Cal. App. 4th 237, 317-18 (Cal. App. 3d 2012) (discussing Proposition 117).

[11]In 2010, Colorado required 76,087 valid signatures to qualify a measure for statewide vote.  Petition entities collect additional signatures to create a "buffer" zone in anticipation that some of the collected signatures are invalid.  For example, Caldara needed to provide 76,087 valid signatures to qualify his Healthcare Choice measure for the ballot but contracted with Kennedy Enterprises to collect 110,000 signatures with a

the circulators working the Healthcare Choice measure were itinerant professionals.  He testified that itinerant professionals are important to all signature-gathering efforts because they do not require training,[12] have a high validity rate, and consistently collect 30 signatures in an hour and sometimes can collect 100 signatures in an hour.

Kennedy Enterprises contracted with Lamm Consulting, a petition entity in Colorado, to gather signatures on the Healthcare Choice Measure.  Scott Lamm, owner of Lamm Consulting, also testified that itinerant professionals were the first contacted to circulate that petition.  Lamm relied on itinerant circulators because only seven and a half weeks remained to collect signatures after the Court enjoined § 1-40-112(4).  In Lamm's words, the signature-gathering campaign had "no time to waste on training people or orienting people on what we needed to do."

The evidence at trial established that any campaign performed without professional circulators would likely spend additional time and resources training new circulators.  Although proponents have six months to collect signatures in Colorado, testimony revealed that, due to legal challenges,[13] signature-gathering efforts are never conducted within a full six-month window.  Additionally, new circulators require at least

_____

75% validity rate.  Ex. B-43.

[12]Lamm and Kennedy testified that itinerant professionals attend a single one-hour training session at the beginning of a campaign in order to review some key statutory provisions regarding the signature-gathering process in Colorado.

[13]Individuals unsatisfied with the Title Board decision may file a challenge with the Secretary within seven days of the decision.  Colo. Rev. Stat. § 1-40-107(1). Registered voters may challenge Secretary's statement of sufficiency.  *See* Colo. Rev. Stat. § 1-40-118.  Caldara said that challenges to the statement of sufficiency raise the cost of qualifying petitions and delay the completion of signature-gathering drives.

a week of training before they are able to collect signatures at a consistent rate.  Thus, as the time to collect signatures grows shorter, professional circulators are an increasingly important part of a successful signature-gathering campaign.[14]

Edward Blaszak, who owns a pay-per-hour signature gathering firm in Oregon and has run pay-per-hour campaigns in other states, testified about the importance of well-trained petition circulators.  Blaszak stated that the training he provides to new circulators allows them to become efficient circulators.  For example, during a petition campaign, the first day at Blaszak's company includes intensive training sessions where circulators practice pitching a proposed measure to registered voters, role playing activities where circulators simulate actual conditions, and on-site training once new circulators are out in public.  Moreover, Blaszak often retrains poorly performing circulators rather than terminating them so long as they continue to provide adequate effort.

Lamm, Kennedy, Blaszak, and William Huckins, one of Blaszak's circulators, testified that, although petition circulation is not a difficult concept to understand, it is not an easy task to master.  Lamm opined that only one out of every ten individuals who attempts to circulate is ultimately successful, while Huckins testified that it took him a "week [to] two weeks" to acquire the necessary skills.  Edward Agazarm, who has been involved in signature-gathering for 19 years, testified that new circulators are less productive because they have not acquired the skills necessary to identify eligible

---

[14]Edward Blaszak, who owns a pay-per-hour signature gathering firm in Oregon, testified that his inability to qualify the casino initiative in Oregon was due in part to the "condensed time-frame."  In that drive, Blaszak charged proponents $5 per signature to collect signatures at a cost of $600,000.

voters and collect a large number of signatures.  Agazarm, Lamm, Blaszak, and Kennedy testified that nonprofessional circulators' lack of skills typically results in lower overall production and lower validity rates.

The evidence at trial established that § 1-40-112(4) would likely exclude some professional circulators (both itinerant professionals and low-volume professional circulators) from working in Colorado.  The testimony demonstrated that itinerant professionals are driven primarily by their earning potential.  Jacob Thaler and David Vaughn, two pay-per-signature itinerant professionals, testified that they would work in Colorado under § 1-40-112(4) if they could earn between $30 to $50 per hour.  Jeffrey Zax, professor of economics at the University of Colorado, Boulder, testified that earning potential is an important criteria itinerant professionals consider when choosing signature-gathering campaigns.[15]

Zax opined that itinerant professionals avoid working in pay-per-hour states such as Oregon because the hourly rate for circulators in those states is between $9 and $12 per hour.  He testified that professional circulators would work in Colorado if their compensation was closely linked to productivity.[16]  Zax described a hybrid compensation model consistent with § 1-40-112(4) that he argued would allow itinerant professionals to maintain the earning potential they possessed under a

---

[15]Huckins was the only circulator who testified that working with a group towards a common goal was more important than his earning potential.  The Court finds that Huckins is not representative of the overwhelming majority of circulators.

[16]Arno testified that some itinerant professionals could be attracted to a hybrid system.  Blaszak also testified that he has attracted a couple of itinerant circulators to his petition entity.

pay-per-signature system.[17]  Zax testified that itinerant professionals could earn $35 per

hour, which consisted of an hourly wage of $28 and a 20¢ bonus for every signature

collected up to 35.  Petition entities could also replicate this hybrid compensation

scheme by calculating a 20% bonus rate from the anticipated hourly production total for

an itinerant professional.

Despite the theoretical plausibility of Zax's model,[18] the Court finds that

§ 1-40-112(4) will likely deter most itinerant professionals from working in Colorado.

First, there was no testimony that any pay-per-hour signature gathering entity pays

circulators the $28 to $50 per hour that pay-per-signature itinerant professionals can

earn.  Blaszak typically pays $14 per hour.[19]  Second, the flexibility afforded to itinerant

professionals by the pay-per-signature model would not be available under a hybrid

compensation scheme.  Moreover, because a petition entity operating under § 1-40-

112(4)'s hybrid scheme must exert more control over its circulators, itinerant

professionals will likely decline to work under such conditions.  According to Arno,

itinerant professionals want the freedom to work in places and during times they are

---

[17]Zax explained that, if a circulator under a pay-per-signature compensation scheme earns $1 per signature and collects 35 signatures in an hour, he will earn $35 per hour.  Under § 1-40-112(4), a circulator could earn $35 for 35 signatures in an hour if he had a base salary of $28 per hour–or 80% of his typical earnings in a hour–and the petition entity offered the circulator a bonus of 20¢ for each signature in an hour up to 35 signatures.  The maximum bonus or incentive per hour would equal $7, allowing the circulator to earn up to $35 in an hour as long as he maintained the same rate of collection for each hour worked.

[18]Zax admitted that he has not interviewed any circulators, either pay-per-hour or pay-per-signature, and that he did not review the testimony of any circulators.

[19]Blaszak testified that he pays part-time employees, those who work fewer than 30 hours a week, $10 per hour.  Full-time employees earn $14 per hour.

likely to gather a high volume of signatures (e.g. grocery store after 6:00 p.m., outdoor events, or sporting events).  Thaler and Vaughn testified that they had reservations about pay-per-hour systems because they would not adequately compensate them for the unusually high production days when they can collect up to 100 signatures in an hour.[20]  Thus, imposing restrictions on itinerant professionals' freedom to work where they want and when they want is likely to not only curtail their production, but also to result in certain professionals' refusal to submit to such conditions.  Additionally, the uncertainty surrounding circulators' employment status (i.e. employee or independent contractor) under a hybrid system will likely deter most itinerant professionals from working in Colorado just as they currently avoid Oregon.[21]   Consequently, the net effect of § 1-40-112(4) will be to deter the majority of itinerant professionals.

The Court finds that the hybrid scheme will also eliminate low-volume professional circulators.  Kennedy and Lamm testified that, because low-volume professional circulators collect only a few signatures during any given week, it would not be economically feasible to compensate these circulators with an hourly wage.  Additionally, they testified that, because it is not feasible to pay low-volume professionals by the hour, the only alternative under the hybrid scheme would be to

---

[20]This is particularly the case under bundling.  Bundling occurs when circulators carry two or more petition sections contemporaneously.  A circulator can significantly increase his earning potential under a pay-per-signature system by utilizing bundling if he can convince one voter to sign multiple petition sections at the same time.

[21]In 2002 Oregon voters passed Measure 26 which bans the use of pay-per-signature compensation for circulators in connection with ballot initiatives in the State of Oregon.  Measure 26's constitutionality was challenged in federal court and was upheld by the Ninth Circuit in *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006).

pay low-volume professional circulators 20¢ per signature.  However, low-volume professional circulators would not find compensation of 20¢ per signature sufficient to continue signature-gathering activities.  By contrast, Lamm and Kennedy testified that, under a pay-per-signature system, they can collect signatures from low-volume professional circulators without oversight because their low productivity (i.e. a net gain of five to fifteen signatures over the course of a week) garners the same compensation regardless of the length of time to collect.  Kennedy and Lamm both testified that the constant flow of high-validity signatures from low-volume professional circulators can account for 20% of total signatures.  These signatures are essential because the high validity rate decreases the burden of collecting "buffer" signatures.

Without access to the majority of itinerant professionals and low-volume professional circulators, petition entities will have to expend more resources training new circulators.  In addition, petition entities will have to compensate circulators for more hours of work in order to generate the 20% of signatures usually provided by low-volume professional circulators.  When time is of the essence, the necessarily greater reliance on new circulators under § 1-40-112(4) increases the likelihood of poor validity and thereby makes it more likely that a signature-gathering campaign will be unsuccessful.[22]  As a result, the loss of itinerant professionals and low-volume professional circulators is likely to raise costs for proponents and make it less likely that an issue qualifies.

---

[22]Blaszak testified that he only had seven weeks to circulate petitions for the casino initiative in Oregon and, although Blaszak was able to gather the requisite number of signatures, the measure failed because reliance on newly trained circulators significantly lowered his validity rate.

### b.  Inefficiency Costs

The testimony at trial established that § 1-40-112(4) would significantly decrease the efficiency of signature-gathering campaigns.  Lamm, Kennedy, and Albie Hurst, an employee of Lamm Consulting, testified that circulators in Colorado under their pay-per-signature models receive compensation only for the signatures they provide and are not compensated for training or travel time.[23]  Additionally, Kennedy and Lamm testified that their firms review petition sections to determine validity rates.[24]  Circulators with validity rates lower than 75% have their compensation partially reduced.

Kennedy testified that he has relatively low day-to-day expenses.  He hires his daughters or temporary agency workers to perform office functions.  On signature collection days, which happen twice a week, crew managers[25] help perform validity

---

[23]Occasionally, petition entities provide advance payments to highly coveted circulators for travel and lodging costs, which are deducted from circulators' future earnings.

[24]To perform validity checks, petition entities purchase the official list of registered voters from the Secretary of State.  The official list contains the names and addresses of all registered voters in Colorado.  Petition entities then take a random sample of names from petition sections and compare them to the Secretary's official list.  Petition entities mark names or addresses in petition sections as invalid if they do not match the names and addresses in the official list.  Additionally, petition entities mark signatures as invalid if they believe the signatures were forged.

[25]Petition entities usually engage three levels of independent contractors.  First, they enter into an independent contract agreement ("ICA") with an area coordinator who is in charge of a large geographic area of the State (i.e. northern Colorado, the Denver metro area, and southern Colorado) but does not collect signatures.  Petition entities then sign ICAs with crew managers who are professional circulators in charge of small groups of circulators.  The crew managers collect signatures and are responsible for choosing circulators based on reputation and previous work experiences.  Finally, petition entities enter into ICAs with circulators based on the recommendation of crew managers.

checks and Bonnie Todd, a circulator who is also a licensed notary, usually notarizes petition sections.  Moreover, because everyone performing work on behalf of Kennedy Enterprises is considered an independent contractor, completing payroll does not require specialized skill.  Kennedy testified that the hybrid scheme would increase his costs of conducting a signature-gathering campaign because he would have to collect signatures daily, could not reduce circulator compensation for low validity rates, and would have to compensate circulators for activities that do not directly yield signatures such as training, rest breaks, and travel time.

Agazarm, who has participated in both pay-per-signature and pay-per-hour campaigns in the State of Oregon,[26] testified that circulators are not as productive under pay-per-hour systems.  Agazarm stated that, because circulator compensation is not tied to productivity under a pay-per-hour system, circulators "shirk"[27] their responsibility to gather signatures.  He further testified that shirking increases a petition entity's exposure to loss because circulators are compensated regardless of how many signatures they collect.  Shirking, however, is non-existent in a pay-per-signature system because circulators are not compensated if they fail to collect signatures.

Arno, who has qualified more than 650 initiatives nationwide since 1979, testified that the cost of running a pay-per-hour drive can double the cost of a pay-per-signature campaign.  Arno based this estimate on a pay-per-hour campaign he performed in

---

[26]In 1999, Agazarm worked in Oregon as a circulator compensated on a pay-per-signature basis and in 2003 he worked in Oregon as a volunteer coordinator for a pay-per-hour campaign.

[27]Shirking occurs when circulators do not provide the appropriate effort in return for the hourly wage.

Oregon after the passage of Measure 26. Arno testified that, under a pay-per-signature system, he could collect 140,000 signatures in Oregon at a rate of $1.55 per signature for a total of $217,000. However, in 2003, after the passage of Measure 26, he spent over $500,000 to collect the same number of signatures. In addition to the added costs identified by Agazarm and Kennedy, Arno testified that pay-per-hour campaigns increase costs because petition entities must hire additional field supervisors to counter shirking, pay overtime to circulators who work longer than 8 hours in a day without permission, and cannot reduce circulator compensation even if circulators report inflated hours.

This testimony was consistent with Blaszak's experience conducting pay-per-hour campaigns. Blaszak testified that he compensates circulators for training and travel time and has field managers supervise circulators. Additionally, Blaszak testified that, in order to counter shirking, his circulators report signature totals twice daily. Blaszak provides bonuses in the form of movie tickets and pizza parties to increase production.[28] Blaszak terminates a circulator if a circulator consistently collects below a certain number of signatures.[29]

Zax acknowledged that a principal weakness of a pay-per-hour system is that circulators will attempt to shirk when given the opportunity. However, Zax opined that

---

[28]Blaszak testified that only 1.8% of the circulators utilized the bonus during his campaign in California.

[29]Although Blaszak did not provide a minimum number of signatures necessary for a circulator to avoid termination, the pay schedule from his recent California campaign shows that the expectation is to collect at least 80 signatures in a 7-hour work shift, or 11 signatures per hour. *See* Ex. D-5. Blaszak's circulators work 8-hour shifts with a 1-hour break.

the 20¢ per signature incentive payment built into § 1-40-112(4) could effectively deter

shirking.  Zax also believed that itinerant professionals would not misrepresent their

hours (i.e. collect 35 signatures in 30 minutes while reporting work for the whole hour)

because petition entities and circulators could renegotiate contracts weekly if an

itinerant professional's production exceeded compensation.  Zax testified that the

hybrid compensation model protects both itinerant circulators and petition entities from

the vicissitudes of signature-gathering because itinerant professionals could potentially

earn $28 per hour even when circulating in poor conditions (i.e. bad weather) and, on

the other hand, petition entities would be underpaying circulators, compared to pay-per-

signature compensation schemes, during periods of unusually high production.

     The Secretary's argument about the flexibility and viability of the hybrid

compensation scheme cannot survive careful consideration.  From a theoretical

perspective, there is no discernible difference between the use of a hybrid system and

a pay-per-signature system.  Under either system, the economic reality for itinerant

professionals is that they would earn $35 for collecting 35 signatures in an hour.

Moreover, although Zax argues that a hybrid system protects itinerant professionals

against poor working conditions, the testimony from Arno, Kennedy, and Thaler

established that itinerant professionals in a pay-per-signature system do not work in

poor weather conditions.  Thus, to the extent Zax's model anticipates protecting

itinerant professionals from poor conditions, the testimony at trial established that this is

an assurance that is not required and would not provide an incentive to attract itinerant

professionals to the hybrid scheme described by Zax.

Second, the prospect of renegotiating a contract is insufficient motivation for itinerant professionals to counter shirking.  Thaler and Vaughn, the two itinerant professionals at trial, testified that the prospect of providing free signatures to petition entities in exchange for future contract renegotiation was unappealing.  Itinerant professionals earn on average $1 for every signature collected.  Under Zax's hybrid model hypothetical, once itinerant professionals meet their negotiated signature threshold (i.e. 35 signatures in an hour), they have no incentive to gather additional signatures.  As Blaszak testified, using a quota is more of a stick, meaning that circulators will work only as hard as necessary to reach the quota and, once reached, will not provide additional effort.[30]

The likely effect of the hybrid compensation scheme described by Zax is that it will not attract itinerant professionals and the lower training cost and higher productivity associated with them and, as a result, will not give petition entities the benefit that Zax noted of undercompensating such persons during periods of higher productivity.

The Court finds that Zax's hybrid model would significantly increase the costs of a signature-gathering campaign.  Zax's model requires that petition entities provide hourly compensation to circulators for orientation, travel costs, and paid rest breaks which are not compensated under a pay-per-signature model.  Petition entities will also have to provide additional compensation for crew managers who would have significantly greater supervisory responsibilities.  Petition entities will likely have to collect signatures daily to ensure that new circulators gather an adequate number of

---

[30]Blaszak testified that he does not tell his circulators to gather 10 signatures per hour because otherwise they will only return 10 signatures.

signatures.  These daily collections will increase costs in two ways: first, petition entities will have to secure the daily services of a notary; and second, petition entities will have to hire an employee to track circulator productivity and make a decision to either terminate employment, renegotiate the contract, or provide more training.  Moreover, negotiating employment contracts on a frequent basis increases exposure to lawsuits for wrongful terminations, employment benefits, or other labor related claims.[31]

Third, because the testimony indicated that only one out of ten new circulators develops into a professional circulator, petition entities will incur greater costs as they compensate unproductive circulators.  For example, Blaszak testified that, even if a circulator provided only 10 signatures for a full 7-hour workday, the circulator would receive compensation of $70[32] for the hours worked that day.  Although at some point the petition entity could terminate an unproductive worker, the cumulative daily loss of $70 to compensate unproductive circulators will increase the costs of the entire campaign.[33]

---

[31]Currently, petition entities are largely immune to unemployment claims because circulators are treated as independent contractors.  Only one instance of an unemployment claim against a pay-per-signature entity was presented at trial.

[32]As noted above, Blaszak's part-time employees earn $10 per hour.  Assuming a full-time employee worked a 7-hour shift, he would be compensated $98 for the 10 signatures returned.

[33]Blaszak testified that it is unlikely a new circulator could work an entire day and provide only 10 signatures because circulators report signatures twice a day.  However, he testified that he would compensate the circulator for the day even if he returned fraudulent signatures.

Accordingly, the Court finds that the cumulative inefficiencies likely to occur as a result of § 1-40-112(4) will significantly increase the costs of running signature-gathering campaigns.

### c.  Independent Contractor vs. Employee

The testimony at trial did not establish whether circulators were currently employees or independent contractors under Colorado law.[34]  As noted above, petition entities in Colorado currently classify circulators as independent contractors.  However, a 2003 audit of Lamm Consulting by the Colorado Department of Labor and Employment ("CDLE") reclassified Lamm's circulators from independent contractors to employees.  *See* Ex. D-79.  Lamm did not appeal the CDLE's decision; instead, Lamm entered into an installment agreement with the CDLE accepting the department's decision.  *See* Ex. D-86.  Nevertheless, to the extent Lamm's failure to appeal the CDLE's decision might have defined the employment status of his circulators, Kennedy and other petition entities have not had to reclassify their circulators.[35]  *See* Colo. Rev.

---

[34] Under Colorado law, an individual performing activities on behalf of a business is generally considered an employee.  To rebut the "employee" presumption, an employer must prove that the worker is "free from control and direction in the performance of the service, both under his contract for the performance of service and in fact."  Colo. Rev. Stat. § 8-70-115(1)(b).  To determine whether an employer has "control and direction" over an employee, courts examine the degree of control the employer has over the means and methods of the employee's work, the ability to terminate a worker at any time without liability, and the ability to set quality standards. *Carpet Exch. of Denver, Inc. v. Indus. Claim Appeals Office*, 859 P.2d 278, 281 (Colo. App. 1993).

[35] Arno testified that he was not required to reclassify his circulators as employees after an audit by both the Internal Revenue Service ("IRS") and the Employment Development Department of California.  Kennedy testified that, after seeking his accountant's professional opinion, he was advised that circulators were independent contractors under Colorado law.

Stat. § 8-74-108 (determinations made under the Employment Security Act are not binding on any other agency or court); *see also Gloston v. ITT Fed. Servs. Int'l Corp.*, No. 06-cv-02168-PSF-BNB, 2007 WL 1830486, at *3 (D. Colo. June 21, 2007) (finding that outcomes made in an unemployment proceeding are not binding in any subsequent litigation not brought under the Colorado Employment Security Act). Because a determination of whether circulators are employees or independent contractors is usually a fact intensive inquiry, and such facts were not presented at this trial, the Court will not resolve this legal issue as it is not necessary for the holding in this case.[36]

### d.  Approximate Cost Increase

The evidence at trial established that an increase in signature gathering costs is unlikely to have an effect on individuals or entities who can raise large sums to qualify a measure for the statewide ballot.  However, the cost increase is likely to disproportionally impact individuals with limited resources by making measure qualification unaffordable.  Caldara, Mason Tvert, and Jennifer Gratz testified that they had to suspend qualifying potential measures in 2010 because of the cost increase associated with § 1-40-112(4).  Although the testimony at trial demonstrated that the per signature price is unlikely to increase to $5.50 because of § 1-40-112(4), the

---

[36]Terry West, an audit manager for the Colorado Department of Labor and Employment, testified that the CDLE usually undertakes a comprehensive review of an employee's duties in connection with the business when making a determination of whether an employee is misclassified as an independent contractor.  *See, e.g.,* Ex. D-32; Colo. Rev. Stat. § 8-70-115.

evidence established that the statute will likely raise prices from a baseline of $2.07 per signature to $2.50 per signature (18%) and possibly to more than $3 per signature.

Kennedy testified that he usually charges a proponent $2.07 per signature for unbundled petitions under a pay-per-signature model.  *See also* Ex. B-43.  On the other hand, Blaszak testified that he typically charges a proponent $5[37] per signature for unbundled petitions.[38]  Blaszak, however, attributed 15 to 20% of his proposed price per signature to the fact that he withholds Federal Insurance Contributions Act ("FICA") tax and provides unemployment and workers' compensation insurance benefits.  Notwithstanding, when discounting 20% from Blaszak's $5 per signature price, his average bid for an unbundled measure remains close to $4.  Assuming Blaszak's typical bid was further discounted from what has been termed his "Cadillac" services, such as 13¢ for creating a voter database, 30¢ for background checks and volunteer recruitment, and 12¢ for processing volunteer signatures, his typical charge remains at $3.45.  Moreover, at the preliminary injunction hearing, Blaszak testified that he would likely bid $2.50 per signature for a Colorado signature-gathering campaign.  Docket No. 48 at 128.[39]

---

[37]In 2006 Blaszak proposed an hourly rate of $30 for 16,500 hours of supervised collection which equals $495,000.  *See* Ex. D-28.  Blaszak testified that this contract had terms similar to those he currently offers.  Blaszak lowered his pay-per-hour rate from $5 to $2.65 in California by bundling petitions.

[38]Blaszak testified that the Casino initiatives are currently re-run as bundled petitions and are averaging $3.25 per signature, while the other two bundled petitions he is running are averaging $2.75 and $2.40 per signature.

[39]Some factors that influence the cost of a signature-gathering campaign include weather, local competition, time available to circulate, election regulations, the popularity of the issue, commercial access, the number of signatures required, the

In addition to raising the per-signature price of campaigns, § 1-40-112(4) deprives petition entities of the flexibility they currently enjoy when negotiating contracts.  Arno, Kennedy, and Lamm testified that pay-per-signature entities can sometimes negotiate to pay circulators as little as 50¢ per signature in order to lower costs to proponents.  Because overhead for petition entities under a pay-per-signature model is typically low, pay-per-signature entities can nevertheless make a profit despite significant decreases in contract prices.  *See* Ex. A-5 at 5-6.  The testimony showed that petition entities will not have this flexibility under a hybrid system as they will be forced to pass on their overhead costs to proponents in order to remain profitable.[40] Blaszak testified that an unbundled pay-per-hour campaign was likely to be too expensive for individuals with limited funds.  He often advises individuals with limited funds to run a campaign using friends and acquaintances.  Given that campaigns run by nonprofessionals are unlikely to succeed, the Court finds that the cost increase associated with § 1-40-112(4) is likely to lower the chances of under-funded proponents succeeding in the initiative and referendum process.

---

regulatory scheme, and bundling.  Because pay-per-hour and pay-per-signature entities are subject to the same external factors when submitting bids to proponents, the majority of these factors will be consistent for proponents submitting bids in Colorado.

[40]Blaszak testified that it would cost $25,000 in overhead to run his company in Colorado.

### C.  Section 1-40-112(4)'s Effect on Reducing Fraud and Invalidity

#### 1.  Validity Rates

Kathryn Mikeworth, the operations manager for the Colorado Secretary of State, testified about the signature verification process.[41]  She said that the Secretary performs a random sample of 5% of the signatures or a minimum of 4,000 signatures on a petition.  Colo. Rev. Stat. § 1-40-116(4).  The Secretary has 30 days to verify signatures and issue a statement of sufficiency, which explains whether proponents have submitted a sufficient number of valid signatures to qualify for the ballot.  Colo. Rev. Stat. § 1-40-118(1).  If the random sample establishes that the number of "presumed valid signatures"[42] is 90% or less of the number needed to qualify for the ballot, the petition is deemed insufficient.  If the random sample establishes that the number of presumed valid signatures is over 110% of the minimum number of signatures required to qualify for the ballot, the measure automatically qualifies.  However, if the random sample shows that the number of signatures is more than 90%, but less than 110% of the number needed to qualify, the Secretary must undertake a line-by-line review of the petition section.  This line-by-line review must be completed within the original 30-day window, meaning that if it takes the Secretary 20 days to

---

[41]Prior to her current position, Mikeworth was the manager of the ballot access program and oversaw the qualification of initiatives for the statewide ballot.

[42]A circulator affidavit creates a presumption of validity for all signatures on the petition section.  These signatures are then counted as valid unless proven otherwise.

conduct a sample of signatures, he has 10 days left to do a line-by-line review of the same petition section.[43]

The Secretary's statement of sufficiency must indicate the number of signatures sampled and whether the number of valid signatures was less than 90% or less than 110%.  *See, e.g.,* Ex. 132 (Statement of Sufficiency).  If the signatures provided by a proponent are insufficient, then the proponent can cure the deficiency by collecting additional valid signatures to meet the statutory threshold (76,047 valid signatures in 2008).  "Cure" signatures must be provided to the Secretary no later than three months before the election is held.

The Secretary follows Rule 17.3 of the Colorado Secretary of State Election Rules to perform the line-by-line review of petition sections.[44]  *See* Ex. C-51.  The Secretary rejects a signature as invalid if the name on the petition section is illegible, the signature is a duplicate, or the name listed in the petition section does not match the address listed in the registered voter database.[45]  To verify submitted signatures, the Secretary compares the name and the address listed on the petition section to

---

[43]During the 2007-2008 election cycle, the Secretary examined approximately 182,000 signatures from 11 proposed measures during the same 30-day window.  To manage the influx of signatures, the Secretary usually employs 30 to 40 temporary staff members during the petition review cycle.

[44]The Secretary has little discretion to reject signatures as invalid and must accept borderline signatures as valid because the circulator affidavit establishes a presumption of validity.

[45]  The Secretary undertakes a multi-step process to identify a registered voter if the name is illegible.  First, he searches by name; second, he searches a combination of a few letters of the first name; third, he searches a combination of a few letters of the last name; and, fourth, he tries to locate the name by the address listed.

SCORE, the voter registration database for the State of Colorado.[46]  Certain restricted

databases in SCORE contain copies of registered voters' signatures.  The Secretary,

however, does not compare the signatures in the petition section with those in SCORE

because it is a security risk to grant temporary employees access to restricted

databases.[47]

The testimony from both sides established that signature compensation

schemes have no measurable impact on validity rates.  Blaszak testified that his validity

rate is usually around 72 to 74%,[48] while Arno and Lamm testified that their validity

rates are often between 70 and 75%.  The testimony also demonstrated that petition

entities attempt to curtail the collection of invalid signatures under both pay-per-hour

and pay-per-signature systems.  Lamm, Arno, Agazarm, and Kennedy testified that they

reduce circulator compensation for validity rates below 75%.  Blaszak testified that he

provides extensive training to his circulators, performs "secret shopper" activities,[49] and

holds daily validity checks to curtail the collection of invalid signatures.  As Blaszak

---

[46]At the time of trial, SCORE contained voter registration information for 3.4 million voters in the State of Colorado.  The 3.4 million number included active and inactive voters.  An inactive voter is an individual who has not participated in the previous November general election or has had a mailed ballot returned as undeliverable.  Inactive voters accounted for 1.2 million voters in the database.

[47]Since 2001, 44 petition sections have gone through the Secretary's verification process and 41 have made the ballot.

[48]The highest possible validity rate in the State of Oregon is 92%; however, even when adjusting for this baseline, Blaszak's validity rates are only 5 to 7% higher when compared to pay-per-signature entities.

[49]Blaszak's managers sometimes disguise themselves as registered voters and approach new circulators about petition sections to determine whether the new circulator is responding to training.

concluded, the validity rates for signatures provided to the Secretary under both systems is comparable, even if the validity of signatures gathered in the field differs.

Moreover, petition entities have an incentive to maintain high validity rates because failure to qualify an issue is detrimental to future business.  For example, Lamm Consulting was replaced by another petition entity when it failed to qualify Tvert's marijuana initiative in 2010.[50]  Caldara testified that he only contracts with Kennedy Enterprises because it "gets the job done."  Caldara stated that, because the money paid for signature-gathering campaigns is non-refundable, proponents carefully select petition entities as proponents stand to lose significant sums if their measure fails to qualify for the ballot.[51]

Finally, none of the evidence presented linked low validity rates to fraud or professional circulators.  On the contrary, low validity rates were usually attributed to new circulators who did not have the skills necessary to ask the right questions. Blaszak testified that his casino initiative in Oregon failed in part because of the "condensed time-frame" in which to collect signatures and the overreliance on new circulators.  In rare instances, the nature of the ballot initiative, by itself, can affect the validity rates.  For example, Lamm attributed the failure of the marijuana initiative to the nature of the measure.  Lamm and Hurst testified that overzealous signers of the marijuana initiative often lied about their age, whether they were registered voters, or

---

[50]The marijuana campaign had a validity rate of 51% in 2010.  Lamm also testified that he did the marijuana initiative in 2006 and had only a validity rate of 65%.

[51]The proponents of the casino initiative in Oregon lost $600,000 when it failed to qualify for the ballot.

whether they signed previous petition sections.  Lamm and Hurst testified that the marijuana initiative had similar problems in Colorado in 2006 and in other states that have attempted to pass a similar measure.  Accordingly, the evidence at trial established that invalid signatures are typically the result of inexperienced circulators or voter error, i.e. registered voters changing addresses without updating the voter registration card,[52] illegible signatures, or individuals not knowing their current voter status.  The testimony did not show that validity rates were affected by the form of compensation scheme.

### 2.  Incidence of Fraud

Ballot petition fraud is a crime in the State of Colorado.  Colo. Rev. Stat. § 1-40-130.  Examples of fraudulent circulator practices include forging signatures, misrepresenting the issue, using an otherwise unqualified person to circulate petition sections on the circulator's behalf (surrogate fraud), signing a circulator affidavit without actually circulating the petition (false witnessing), and offering a registered voter something of value in exchange for a signature (inducement).  Kennedy, Arno, Lamm, Hurst, and Blaszak testified that circulator fraud occurs regardless of the compensation scheme because certain individuals are prone to commit fraud.  None of the evidence, however, established the rate of fraud in the initiative process or the amount of fraud attributed to pay-per-signature circulators.

Mikeworth and Hillary Rudy, the senior legislative and policy analyst for the elections division of the Secretary of State's office, testified that, because of a lack of

---

[52] The voter registration database is a live system so that as soon as a voter registration is updated, the system makes the change retroactively.

resources, the Secretary is unable to detect circulator fraud that occurs in the field, such as misrepresentation, surrogate fraud, false witnessing, and inducement.  Rudy testified that the Secretary is also unable to detect forgeries when petition sections are reviewed because the temporary employees who are often hired to conduct validity checks do not have access to restricted SCORE databases.[53]

The Secretary argues that pay-per-signature systems provide more of an incentive to commit fraud when compared to pay-per-hour systems or § 1-40-112(4)'s hybrid scheme.  However, the evidence at trial actually proved the contrary, namely, that the incentive to commit fraud is likely stronger under a hybrid scheme when compared to a pay-per-signature system.

Huckins, Blaszak, and Zax testified that one of the benefits of working under an hourly wage system is the security of guaranteed compensation for the hours worked. Yet both Blaszak and Zax acknowledged that an employee getting below a certain number of signatures should eventually be terminated.  Blaszak testified that he terminates employees who consistently fail to reach a minimum number of signatures. As Arno noted, the security of guaranteed compensation is undermined by the pressure to maintain a minimum level of production.  As a result, the existence of a minimum number of signatures that an hourly employee must gather creates an incentive to commit fraud.  For example, if at the end of a given workweek, a circulator employed under a hybrid system of compensation is several signatures short of her weekly quota and knows she faces termination if she does not reach the quota, that circulator has an

---

[53]There have been no reported incidents of a forged signature discovered by the Secretary.

incentive to fraudulently obtain the remaining signatures.  Under this scenario, an underperforming circulator in a hybrid system faces a stark choice: either provide fraudulent signatures and retain employment, or miss the weekly quota and forgo future compensation.  Moreover, it is difficult to detect these fraudulent "fill-in" signatures because the other signatures on the petition section are usually valid.  Therefore, the circulator's validity rate remains high because of the small chance of sampling the "fill-in" signatures.  Although a hybrid scheme may decrease the incentive to commit fraud because it guarantees compensation, it will act to encourage fraud by pressuring nonproductive circulators to meet daily or weekly quotas, whether those quotas are stated or not.

On the contrary, the incentive to commit fraud under a pay-per-signature system is the possibility of earning an extra dollar for every fraudulently collected signature. Circulators in pay-per-signature systems have no pressure to meet weekly quotas, are not at risk of losing their positions, and, in fact, pay-per-signature entities rely on low-volume professional circulators to provide 20% of the overall signatures collected. Thus, any incentive to commit fraud in a pay-per-signature model is solely based on a circulator's desire to maximize his or her compensation.  Arno, Blaszak, and Agazarm testified that large scale forgery is easily detectable[54] as evidenced by the examples of Claudia Kenny in Washington and Blaszak's employee in Maine.[55]  Vaughn also

---

[54]For example, large scale forgeries may be obvious because the petition section is in alphabetical order, all the male signatures are legible, all signatures have the same handwriting, or the petition section is clean.

[55]Kenny was a pay-per-hour circulator in the State of Washington who forged a large number of signatures; Agazarm was able to detect the fraud because her petition

testified that it is actually easier to collect signatures than to attempt forgery. Consequently, because large scale fraud is easier to detect, circulators who commit such fraud are unlikely to escape detection.[56]  As a result, under a pay-per-hour system, the marginal return of forging a signature can be, by meeting a quota, retaining one's employment, whereas the marginal return of forging a signature under a pay-per-signature system is what is paid for a signature.  Losing one's job is a greater incentive to commit fraud when compared to the prospect of earning an additional dollar.

From a theoretical viewpoint, pay-per-hour signature gathering, rather than pay-per-signature gathering, incentivizes fraud.  However, the evidence at trial of actual fraud was minimal and established that fraud occurs under both pay-per-hour[57] and pay-per-signature systems because some individuals are simply prone to commit fraud.[58]

---

section was clean and all the signatures were of the same handwriting.  Blaszak testified that one of his pay-per-hour employees in Maine requested to switch compensation to pay-per-signature.  The next day the employee returned with 3,000 signatures, which Blaszak determined were fraudulently gathered due to the short turnaround.

[56]Because petition entities have the official list of registered voters' names and addresses, circulators are unlikely to escape detection if they provide a large number of false names and addresses.

[57]Blaszak testified that he had at least nine instances of circulator fraud in his recent campaign in California.  *See* Ex. D-31.

[58]During the 2008 election cycle, Thomas Coombes, a Lamm Consulting pay-per-signature circulator, was charged with circulator fraud for inducing voters to provide signatures in exchange for sunglasses.  *See* Ex. D-47.  Jerome Toliver, a Lamm Consulting pay-per-signature circulator, signed a circulator affidavit for a petition section he did not circulate (false witnessing).  *See* Ex. C-83 at 16-20.  Other complaints during the 2008 election cycle include allegations that certain circulators did not wear petition circulator badges, provided false and misleading statements about

## II.  CONCLUSIONS OF LAW

When plaintiffs challenge a State statute regulating the election process under the First Amendment, the court must first consider the "character and magnitude" of the burden the State's regulation imposes on plaintiffs' First Amendment rights and then weigh this burden against the precise interests the State contends justify the burden. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  Regulations imposing severe burdens on plaintiffs' rights are subject to strict scrutiny and must be narrowly tailored to advance a compelling State interest.  *Id*. at 358-59; *see also Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008) (noting that, to survive strict scrutiny, the State "has the burden of proving that its [regulation] is narrowly tailored to serve a compelling state interest") (citation omitted).  Regulations that impose lesser burdens, however, trigger less exacting review and are subject to a balancing test whereby "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."  *Timmons*, 520 U.S. at 358-59. Because of the flexibility of the standard, there are no bright line rules that separate permissible election-related regulation from unconstitutional infringements of First Amendment Freedoms.  *Id*.; *see also Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (describing the Supreme Court's flexible approach in similar First Amendment cases as a "sliding scale").  Accordingly, the Court must determine which standard of review will apply to § 1-40-112(4).  *See Campbell v. Buckley*, 203 F.3d 738, 742 (10th Cir. 2000).

---

certain petitions, and used trickery to collect signatures.  *See* Ex. C61-72.  However, all of these complaints were dismissed for failure to state a claim.  *See* Ex D-73 (dismissing claims identified in C61-C72).

Generally, whether a regulation faces a balancing test or strict scrutiny depends on the severity of the burden the regulation places on speech.  *Lee*, 463 F.3d at 768. Where a law appears on its face to regulate the initiative process, courts should engage in a searching inquiry to determine if, in regulating the process, a State has gone too far by instituting procedures which effectively limit underlying speech.  Therefore, the essential consideration is how severe a burden a particular regulation effectively places on the underlying speech.  *See Timmons*, 520 U.S. at 358.

In *Meyer v. Grant*, 486 U.S. 414 (1988), the Supreme Court observed that initiative petition circulation necessarily involved "both the expression of a desire for political change and a discussion of the merits of the proposed change."  *Id*. at 421. The Court explained that, because petition circulation involves the type of interactive communication concerning political change, it is appropriately described as "core political speech."  *Id*. at 422.  The Court characterized Colorado's statute barring the use of paid circulators as "a limitation on political expression" and applied "exacting" scrutiny because the statute imposed an unacceptable burden on the exercise of First Amendment rights.  *Id*. at 420-22.

In *Buckley v. Am. Constitutional Law Found.*, *Inc.*, 525 U.S. 182 (1999), the Supreme Court addressed three different provisions of a Colorado ballot initiative statute which required that (1) circulators be registered voters, (2) circulators wear identification badges, and (3) proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator.  *Id*. at 186. After describing petition circulation as core political speech, the Supreme Court

explained that "'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'" *Id*. at 192 (quoting *Timmons*, 520 U.S. at 359). Without specifying whether these restrictions imposed a severe burden on speech necessitating strict scrutiny or a lesser test, the Court struck down each of the three restrictions.  The Court found that the regulations discouraged participation in the petition circulation process, which limited the number of voices available to convey a proponent's message and cut down the size of the audience that could be reached. *Id*. at 194-95.

The reasoning employed by the Supreme Court in *Buckley* suggests that the level of scrutiny applicable in a case such as this depends on the extent to which the relevant statutory provision burdens the expressive activities of the parties challenging its validity.  *See* 525 U.S. at 192 (applying exacting scrutiny because the challenged statutory provisions "significantly inhibit[ed] communication with voters about proposed political change"); *Prete v. Bradbury*, 438 F.3d 949, 961-68 (9th Cir. 2006) (reading *Buckley* to account not only for the existence of a "decrease in the pool of available circulators" in determining the severity of the burden on expressive activities resulting from a statutory provision, but also for the "*degree* of the decrease") (emphasis in original); *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 385-87 (6th Cir. 2008) (applying strict scrutiny because the harsh penalties and the broad ban on the types of payments made the Ohio provision closer to the ban in *Meyer*); *Person v. New York State Board of Elections*, 467 F.3d 141, 143 (2d Cir. 2006) (applying a balancing test

rather than strict scrutiny because the challenged statute did not significantly burden the plaintiffs' expressive activities); *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 616-17 (8th Cir. 2001) (applying what appears to be a balancing test and finding that plaintiffs "produced no evidence" that the regulation burdened their First Amendment rights, while the State presented evidence of fraud in support of the regulation).

Here, the Secretary contends that § 1-40-112(4) imposes an insignificant burden on speech and should be subject to a balancing test under *Timmons*.  Plaintiffs, on the other hand, contend that § 1-40-112(4) is a severe burden on core political speech under *Meyer* and the statute should be subject to strict scrutiny.

### A.  Severity of the Burden

Section 1-40-112(4) states that "[i]t shall be unlawful for any person to pay a circulator more than twenty percent of his or her compensation for circulating petitions on a per signature or petition section basis."  Colo. Rev. Stat. § 1-40-112(4).  Plaintiffs argue that the hybrid scheme reduces the pool of available circulators and increases the costs of running a signature-gathering campaign as it significantly decreases efficiency.

Courts faced with challenges to statutes similar to § 1-40-112(4) have reached different conclusions as to whether restrictions on per-signature compensation are subject to strict scrutiny or a balancing test.  For example, in *Deters,* the Sixth Circuit applied strict scrutiny to a statute restricting per-signature compensation because the statute increased the cost of qualifying an initiative and likely decreased the number of

professionals willing to collect signatures.  518 F.3d at 385.  The Sixth Circuit found that eliminating all but one form of payment was not merely "academic" because preventing plaintiffs from providing bonuses, setting minimum signature requirements, or tying productivity to compensation stripped plaintiffs of the means to motivate circulators, thereby making qualifying initiatives more expensive.  *Id*.  *Deters* rejected the State of Ohio's argument that pay-per-signature compensation created an incentive to forge signatures because the State had provided no evidence to that effect.  *Id*. at 387.

In *Prete*, the Ninth Circuit found that plaintiffs had not shown that pay-per-signature compensation significantly burdened their First Amendment rights because there was no evidence that the statute in question "caused a reduction in the number of available circulators or otherwise limit[ed] the size of plaintiff's audience." 438 F.3d at 965.  The Ninth Circuit applied a balancing test and found that the statute was distinguishable from the statute in *Meyer* because it only prohibited one form of payment and allowed for incentive payments and other tools to motivate circulators.  *Id*. at 952 n.1.

In *Jaeger*, the Eighth Circuit upheld a ban on per-signature compensation because plaintiffs had failed to provide evidence that "payment by the hour, rather than on commission, would in any way burden their ability to collect signatures."  241 F.3d at 617-18.  Similarly, the Second Circuit in *Person* found that the plaintiff had failed to provide evidence that the ban on pay-per-signature compensation significantly burdened his expressive activities.  467 F.3d at 143.  The Second Circuit explained that it found "insufficient support for a claim that the ban on per-signature payment is akin to

the complete prohibition on paying petition circulators that was deemed unconstitutional in *Meyer*, or that the alternative methods of payment it leaves available are insufficient." *Id.*; *see also Bernbeck v. Gale*, 2011 WL 3841602 (D. Neb. Aug. 30, 2011) (plaintiffs did not show evidence of a burden on their First Amendment rights by a pay-per-signature requirement); *Citizens in Charge v. Gale*, 810 F. Supp. 2d 916 (D. Neb. 2011) (the State had not shown how its statute promoted its interest when it relied on only three instances of fraud).

Unlike some of the aforementioned cases, the plaintiffs in this case have provided evidence showing that § 1-40-112(4) imposes a severe burden on their expressive activities. Although § 1-40-112(4) is not a categorical restriction on one form of circulator compensation as in *Deters*, or a categorical exclusion of circulators, *see Buckley*, 525 U.S. at 192-98 (exclusion of circulators not registered to vote); *Meyer*, 486 U.S. at 414 (exclusion of all paid circulators); *Yes On Term Limits*, 550 F.3d at 1028 (exclusion of out-of-state circulators); *Chandler v. City of Arvada, Co.,* 292 F.3d 1236, 1244 (10th Cir. 2002) (exclusion of circulators that were not residents of the city), the effect of the hybrid scheme is nevertheless significant as it excludes a key component of circulators from the initiative process. Although § 1-40-112(4) allows for incentive payments to motivate circulators, the benefits of the incentive payments are outweighed by the exclusion of the most effective circulators and the additional costs the statute imposes on signature-gathering activities. *See Deters*, 518 F.3d at 383 (although the availability of other payment methods might reduce the burden, the extent to which the more effective means are foreclosed is an important consideration).

As discussed above, the statute is likely to eliminate low-volume professional circulators from participating in the initiative process and likely to deter most itinerant professionals from working in Colorado.  Their absence will make it significantly more difficult for proponents to qualify measures for the ballot.  Without low-volume professional circulators and itinerant professionals, proponents will have to rely on volunteers and untrained paid circulators who are unlikely to "get the job done."  Thus, the effect of § 1-40-112(4) will be the exclusion from the initiative process of those who, through experience and self-selection, are the most efficient and effective circulators. *See Meyer*, 486 U.S. at 424 ("The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").  To the extent § 1-40-112(4) prevents proponents from using individuals who would most effectively convey their message to the public, the statute places a substantial burden on the proponents' First Amendment rights, even if the statute only restricts proponents from using some, but not all, circulators.  *See Krislov v. Rednour*, 226 F.3d 851, 862 (7th Cir. 2000) (finding that a circulator residency restriction imposed a significant burden on plaintiff's First Amendment rights even if it excluded only a few circulators).

The testimony at trial established that the effect of § 1-40-112(4) will be to raise the per signature cost for a ballot petition campaign by at least 18%.  The effect of raising the per signature cost by 18% will be to restrict participation in the initiative process for proponents with limited resources.  *See Meyer*, 486 U.S. at 423 (statute is a burden on speech as it limits proponents' "ability to make the matter the focus of statewide discussion").  Gratz testified that, after the Colorado Civil Rights Initiative

37

failed in 2008, donors were deterred from pursuing a petition campaign in the 2010 general election because of the anticipated increase in costs once the Colorado Assembly enacted H.B. 1326.  Caldara said that, although some proponents could afford the high costs of a campaign, he would be unable to fund future signature-gathering campaigns because of the increases in costs.  Tvert testified that, because of the large number of signatures required to qualify an issue for the ballot, even minor increases in the price of a single signature could significantly raise the costs of a signature-gathering campaign from $200,000 to $300,000.  Finally, Kennedy testified that even a 25¢ increase in the per signature price could have the effect of pricing proponents out of running initiatives, especially in a tough economic climate.  The Court finds that an 18% cost increase is significant.  By raising the cost of signature-gathering activities, § 1-40-112(4) will have the inevitable effect of reducing the total quantum of speech on a public issue.  *Id.*[59]

Accordingly, the Court finds that § 1-40-112(4) imposes a severe burden on petition proponents and strict scrutiny applies.  As the Tenth Circuit stated in *Chandler*, "petition circulation . . . is core political speech, because it involves interactive communication concerning political change," and consequently, First Amendment protection for this activity is "at its zenith."  292 F.3d at 1241 (quotations and alteration omitted).  "[W]here the government restricts the overall quantum of speech available to

---

[59]Moreover, because § 1-40-112(4) restricts the means of communication (i.e. payment to circulators), it affects the *communicative means* of persons advocating a position in a referendum and does not solely touch the process by which legislation is enacted.  *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1100 (10th Cir. 2006).

the election or voting process . . . [such as] where the quantum of speech is limited due to restrictions on . . . the available pool of circulators or other supporters of a candidate or initiative," strict scrutiny applies.  *Yes on Term Limits*, 550 F.3d at 1028 (quotations and citations omitted).

### B.   Strict Scrutiny

To survive strict scrutiny, the Secretary has the burden of proving that the hybrid scheme is narrowly tailored to serve a compelling State interest.  *Yes on Term Limits*, 550 F.3d at 1028 (citation omitted).  The Secretary argues that § 1-40-112(4) furthers the State of Colorado's compelling interest in maintaining the integrity of the initiative process by reducing the incentive to commit fraud, increasing the validity of signatures, and maintaining public confidence in the initiative process.

The Court finds that the State of Colorado has a compelling interest in ensuring the reliability and honesty of the referendum and initiative process.  *See Buckley*, 525 U.S. at 187 (there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process); *Am. Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1098 (10th Cir. 1997) (the State has interest in both candidate elections and ballot issues); *Campbell*, 203 F.3d at 741 (the Colorado General Assembly has authority to adopt legislation designed to prevent fraud or mistake or other abuses in petition process). Nevertheless, the Court finds that § 1-40-112(4) is not narrowly tailored to meet this compelling interest.  *See Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (noting that a "statute is narrowly tailored [for First Amendment purposes] if it targets and eliminates

no more than the exact source of the 'evil' it seeks to remedy").  None of the evidence at trial established a connection between the type of compensation and the validity rates of petition sections.  Instead, low validity rates were often the result of voter error or the use of inexperienced circulators.  In addition, the trial evidence established that the incentive to commit fraud under a hybrid compensation system is likely greater than the incentive to commit fraud under a pay-per-signature system.  Moreover, the frequency of fraud showed no measurable difference under any compensation model. Rather, the evidence established that, because most compensation models create financial incentives to motivate workers, certain individuals will commit fraud to earn more money regardless of the compensation scheme.  Thus, the Secretary has provided no evidence that, as a class, pay-per-signature circulators are more likely to commit fraud when compared to circulators compensated under a different compensation scheme.  *See Buckley*, 525 U.S. at 204 n.23 ("While testimony in the record suggests that occasional fraud in Colorado's petitioning process involved paid circulators, it does not follow like the night the day that 'paid circulators are more likely to commit fraud and gather false signatures than other circulators'") (citations omitted); *Deters*, 518 F.3d at 387 (whether "someone faced with the incentive to pad signatures will actually act upon it . . . is an empirical question, one for which there is little in the record to answer."); *Meyer*, 486 U.S. at 426 ("we are not prepared to assume that a professional circulator – whose qualifications for similar future assignments may well depend on a reputation for competence and integrity – is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot").

Additionally, the Court finds that the evidence relied upon by the Colorado General Assembly in enacting § 1-40-112(4) does not entitle the statute to deference.[60] *See Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."); *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994) (noting that, although legislatures are far better equipped than the judiciary to "amass and evaluate the vast amounts of data," courts have an "obligation to exercise independent judgment when First Amendment rights are implicated"); *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 129 (1989) (noting that deference to the legislature does not "foreclose [courts] independent judgment of the facts bearing on an issue of constitutional law"); *Sampson v. Buescher*, 625 F.3d 1247, 1261 (10th Cir. 2010) (finding that the State had not shown the disclosure regulation was sufficiently important to a governmental interest in light of the burden on plaintiffs' associational rights).  Although a State need not present "elaborate, empirical verification" of the weight of its purported justification when the burden is moderate, *see Timmons*, 520 U.S. at 364, it must come forward with compelling evidence when the burden is higher. *See Buckley*, 525 U.S. at 203-04; *Meyer,* 486 U.S. at 425; *Deters*, 518 F.3d at 387.

---

[60]Mark Grueskin, an attorney who specializes in election campaign finance and initiative petition litigation, testified that during the General Assembly debate on H.B. 1326 the legislators were shown a videotape of an underaged petition circulator, *see* Ex. D-49, and were presented with three photographs of allegedly false circulator addresses and a letter showing that five notaries who notarized circulator signatures were not licensed in Colorado.  *See, e.g.*, Ex. D-68 (Legislative History of H.B. 1326). Grueskin said that the General Assembly also heard testimony from various individuals about the benefits and potential problems raised by H.B. 1326.

Furthermore, there are less restrictive means to accomplish the State's goal of protecting the integrity of the initiative process. Rudy and Mikeworth testified that, because of a lack of resources, the Secretary is unable to detect a significant amount of circulator fraud. However, the Supreme Court has never held the lack of public resources to be sufficient justification for a regulation to survive strict scrutiny. *Cf. Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 575 (6th Cir. 2012) (noting that the "[Supreme] Court has never held the efficient allocation of public resources to be an interest sufficient to survive heightened scrutiny"). There are alternatives that would address the problems targeted by § 1-40-112(4) without imposing a severe burden on plaintiffs' First Amendment rights. As the Supreme Court noted in *Buckley*, Colorado retains several safeguards to protect the integrity of the initiative process and diminish corruption. *See, e.g.,* Colo. Rev. Stat. § 1-40-106 (making it a crime to forge signatures); Colo. Rev. Stat. § 1-40-130 (making false witnessing, surrogate fraud, and false witnessing punishable by a fine of up to $1500 or imprisonment for not more than a year). "These provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition," especially since there has been little evidence that § 1-40-112(4) will have any effect on the incidence of fraud. *Meyer*, 486 U.S. at 427; *see also Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 800 (1988) (noting that "the State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements"). Second, Colorado could publicly disclose petition sections, which would communicate information to the public without burdening plaintiffs' First Amendment rights. *See Doe*

*v. Reed*, --- U.S. ----, 130 S.Ct. 2811, 2820 (2010) ("The signer [of the petition] is in the best position to detect these types of fraud, and public disclosure can bring the issue to the signer's attention").  These more narrowly tailored options are in keeping with the First Amendment directive that government not infringe on the freedom of speech absent compelling necessity, and then, only by means precisely tailored.  *Burdick v. Takushi*, 504 U.S. 428, 439 (1992).

Given the availability of other effective and less burdensome statutory tools to safeguard the State's interest, the Court concludes that § 1-40-112(4) poses an undue restriction on plaintiffs' First Amendment rights.  While the Secretary has provided evidence that fraud has occurred when the pay-per-signature method is used, he has not isolated the cause of circulator fraud as being the pay-per-signature method.  Consequently, the State has failed to provide evidence that its regulation is narrowly (or even reasonably) tailored to further its important interests.  Accordingly, the Court finds that Colo. Rev. Stat. § 1-40-112(4) is unconstitutional because it "unjustifiably inhibit[s] the circulation of ballot-initiative petitions."  *See Buckley*, 525 U.S. at 205.

### C.   Balancing Test

Given the Secretary's failure to show that pay-per-signature compensation incentivizes fraud to a greater extent than pay-per-hour compensation, the statute also fails the balancing test that courts have applied.  *See, e.g., Burdick*, 504 U.S. at 434 (noting that courts should balance "the character and magnitude of the asserted injury" to the rights protected by the First Amendment against "the precise interests put forward by the State as justifications for the burden imposed" by the regulation);

*Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 213 (1986) (same).  As noted above, the State has a legitimate interest in ensuring the reliability and honesty of the referendum and initiative process.  *See Buckley*, 525 U.S. at 187.  Colorado's law does not survive a balancing test, however, because the hybrid scheme does not sufficiently relate to the State's legitimate interest in reducing fraud or corruption.  *See Deters*, 518 F.3d at 387.  Although the State is permitted "considerable leeway" in regulating the electoral process, this latitude is premised on the requirement that legislative choices not produce "undue hindrances to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 191-92.  This leeway does not apply here because the precise interest that the State identifies – fraud reduction – is not furthered by the statute.  Moreover, the burden imposed by the statute, as discussed above, will likely reduce the number of qualifying initiatives and make it more difficult for proponents to attract financial support.  The net effect will be to encumber the petition process unjustifiably and thereby reduce the "unfettered interchange of ideas for the bringing about of political and social changes."  *Meyer*, 486 U.S. at 421 (citation omitted).  Thus, on balance, the State's legitimate interest in reducing fraud is outweighed by the burden imposed on plaintiffs' First Amendment rights.  *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) ("In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights").

### D.   Permanent Injunction

Having found that Colo. Rev. Stat. § 1-40-112(4) is an unconstitutional infringement of plaintiffs' First Amendment rights, the Court next addresses plaintiffs' request for a permanent injunction and declaratory judgment that the statute is unconstitutional.

To obtain permanent injunctive relief, a party must satisfy the following four factors: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Monsanto Co. v. Geerston Seed Farms*, --- U.S. ----, 130 S.Ct. 2743, 2756 (2010) (citation omitted).

Addressing the first factor, plaintiffs have shown that, unless the statute is enjoined, they will likely face irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *see also Dombrowski v. Pfister*, 380 U.S. 479, 485-86 (1965) (holding that an allegation of impairment of freedom of expression demonstrated an irreparable injury).

With respect to the second factor, plaintiffs have no adequate remedies at law because damages cannot replace the loss of protected First Amendment rights. *See Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages"); *see also Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011).

With regard to the balance of the equities, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 130 S.Ct. 876, 898 (2010).  Plaintiffs have a fundamental interest in being able to express their desire for political change and actively work toward achieving that goal through the ballot initiative process that the Colorado Constitution has provided.  The State is unlikely to be harmed because, as discussed above, there is no evidence that there would be any less fraud under § 1-40-112(4)'s hybrid compensation scheme than under a pay-per-signature scheme.  Therefore, the equities also tilt in plaintiffs' favor.

Based on the foregoing, the Court finds that plaintiffs have met their burden of showing that they are entitled to a permanent injunction of the enforcement of Colorado Revised Statutes § 1-40-112(4).  Plaintiffs are also entitled to a permanent injunction of any ancillary statute which enforces § 1-40-112(4), namely, Colorado Revised Statutes §§ 1-40-135 and 1-40-121 to the extent that those sections apply to the restriction on per-signature compensation found in § 1-40-112(4).

## III.  CONCLUSION

Therefore, it is

**ORDERED** that, pursuant to the parties' Consent to Entry of Final Judgment on Plaintiffs' First Claim [Docket No. 339], judgment shall enter in favor of plaintiff and against defendant Scott Gessler, in his official capacity as Colorado Secretary of State, on plaintiffs' first claim for relief.  It is further

**ORDERED** that judgment shall enter in favor of plaintiffs and against defendant Scott Gessler, in his official capacity as Colorado Secretary of State, on plaintiffs' fifth claim for relief.  It is further

**ORDERED** that defendant Scott Gessler, in his official capacity as Colorado Secretary of State, is PERMANENTLY ENJOINED AND RESTRAINED from enforcing Colo. Rev. Stat. § 1-40-112(4), any ancillary provision which enforces Colo. Rev. Stat. § 1-40-112(4), and Colo. Rev. Stat. § 1-40-112(1).

DATED March 29, 2013.

BY THE COURT:

 s/Philip A. Brimmer                                        
PHILIP A. BRIMMER
United States District Judge